## SMITH v. UNITED STATES.
### No. 10570.

Circuit Court of Appeals, Sixth Circuit.
June 21, 1948.

McALLISTER, Circuit Judge, dissenting.

———◆———

Henry C. Lavine, of Cleveland, Ohio, for appellant.

Marcus L. Friedman, of Toledo, Ohio (Don C. Miller, of Cleveland, Ohio, and Marcus L. Friedman, of Toledo, Ohio, on the brief), for appellee.

Before MARTIN, McALLISTER, and MILLER, Circuit Judges.

MARTIN, Circuit Judge.

Appellant, J. Robert D. Smith, was sentenced to three years' imprisonment upon conviction by jury verdict of wilful and corrupt perjury in violation of section 125 of the Criminal Code, Title 18, section 231, U.S.C.A. He insists that the District Court committed reversible error in overruling his motion for a directed verdict of acquittal and in declining to discharge him for the alleged reason that there was insufficient evidence of perjury to justify submission of the case to the jury.

The indictment upon which he was convicted charged that, on February 19, 1947, Smith committed wilful and corrupt perjury in testifying under oath before Norman Joss, a special agent for the Intelligence Unit, Bureau of Internal Revenue of the Treasury Department. It was charged that his testimony was material to the investigation then being conducted by that official. The indictment charged specifically that Smith swore falsely that, on the date mentioned, he had no accounts or monies to his credit with, or in the hands of, any brokerage firm in Toledo, Ohio, or elsewhere; whereas, in fact, appellant well knew that he had a credit or cash balance of $11,823.09 with the brokerage firm of Bell and Beckwith in Toledo. It was further charged in the indictment that the false statement of appellant was made for the purpose of defrauding and deceiving the United States Government, which, at the time, had against him a claim in excess of $100,000 for unpaid income taxes due and owing by Smith.

Concededly, Special Agent Norman Joss possessed the essential legal qualifications to administer the oath to appellant, and did so. It cannot be denied that the testimony given before him by appellant was material to the official investigation being conducted. Moreover, the agent informed appellant of his constitutional right not to testify or give incriminating evidence against himself.

Appellant was interrogated in the presence of Willard Rutchow, Deputy Collector of Internal Revenue at Toledo and Mrs. Alma E. White of the Intelligence Unit of the Bureau of Internal Revenue at Toledo. Mrs. White recorded in shorthand the questions asked appellant and the answers given by him. She subsequently transcribed her shorthand notes; and both the original notes and the transcribed record were introduced in evidence at the trial.

After the appellant had been questioned concerning his income from all sources for the years 1944, 1945, and 1946, and as to where he might have had money on deposit, it appears from the testimony of Joss and that of Mrs. White that Joss asked appellant Smith this question: "Do you carry any brokerage accounts with any bond houses?" The appellant answered: "No, Sir." The indictment rests upon the charge that this answer constituted wilful and corrupt perjury.

To prove that the sworn statement of appellant was false, the Government introduced as a witness William J. Smith, custodian of books and records of Bell and Beckwith of Toledo, commission brokers holding a membership on the New York Stock Exchange. He testified that appellant originally opened an account with his firm on December 19, 1945; closed it on January 8, 1946; reopened it on November 18, 1946, for deposit of two hundred shares of General Motors stock; and that, on February 19, 1947, the crucial date, appellant J. Robert D. Smith had a credit balance with Bell and Beckwith of $11,823.09, which had been credited to his account on February 6, 1947, from the proceeds of the sale on that date by appellant's order of the two hundred shares of General Motors stock belonging to him. The witness testified further that the account thus remained open continuously until June 26, 1947, when the money was paid to the Collector of Internal Revenue at Toledo pursuant to notice of levy under date of the preceding day.

The broker, who at the time he testified, was a member of the firm of Bell and Beck-

with, stated that on February 6, 1947, Attorney Eugene Howard telephoned him that his client, J. Robert D. Smith, wished to sell his General Motors stock, which was on deposit with Bell and Beckwith. The broker told the attorney that he desired direct instructions from the appellant, who then took the telephone and gave instructions to sell the stock at the market. The witness was positive in his statement that he recognized the voice of appellant.

He testified further that, around the time the money was received from the sale of the stock, he read in newspapers that the Government had filed levies and distraint warrants against appellant; whereupon, he sought legal counsel and was advised to freeze the account. When appellant, accompanied by his attorney on February 6, 1947, came to withdraw the proceeds of the stock sale, he was told that the Government had seized the money and that he could not get it; that the account was frozen. There was some confusion in the testimony of the witness as to whether his firm was holding the money for the United States Government or for appellant; but, on redirect examination, the broker stated that, as far as the account with his brokerage firm was concerned, the money realized from the General Motors stock was the property of appellant.

William Rutchow, Deputy Collector of Internal Revenue at Toledo, was presented as a Government witness. He swore that, on January 29, 1947, four warrants for distraint were issued for the purpose of reaching all property of appellant; that, altogether, some thirty different levies were filed against him as assets came to light; and that the levy filed upon the funds belonging to appellant on deposit with Bell and Beckwith was filed and served on June 26, 1947. This witness corroborated the testimony of Joss and Mrs. White as to answers given by appellant to questions asked him on February 19, 1947, including the assertion by appellant, when questioned by Rutchow that he had no present recollection of buying any General Motors stock; that he had never possessed any in his own name, but had bought some for his mother, who lived in Florida.

The last witness put on the stand by the Government was Joseph M. Drugay, Chief of the Toledo Field Division, Bureau of Internal Revenue. He personally served the notice of levy on Bell and Beckwith demanding that the amount owed by that firm to appellant be applied in payment, pro tanto, upon the amount of $121,909.01, owed by appellant to the United States in internal revenue taxes. He explained that a warrant for distraint is merely a bill for collection presented to the taxpayer. At the conclusion of the Government's proof, appellant moved that the indictment be dismissed and the defendant discharged because of the insufficiency of the indictment. After hearing argument, the court overruled the motion.

Only two witnesses, Eugene Howard and Henry R. Bloch, both lawyers, were introduced by appellant, who did not testify in his own behalf. The District Judge was careful to instruct the jurors that the failure of the defendant to testify should not in any manner whatever prejudice him in their eyes.

Mr. Howard testified to the circumstances under which appellant retained him as one of his attorneys. He asserted that his client told him that he had some General Motors stock which he wanted to dispose of, in order to raise money to make a bond required in connection with litigation with his wife. He testified to the same general effect as did broker William J. Smith concerning the orders to sell the General Motors stock. He said that appellant instructed the broker to sell the stock, send him the money, and close the account; that about two days after the sale there was "a lot of publicity" in local newspapers concerning the issuance of distraint orders and levies against all of appellant's property; and that he received a telephone call from Mr. Bloch, attorney representing Bell and Beckwith. Mr. Bloch stated over the 'phone that he had advised the brokerage firm that, "even though they were not under any order of the Government, they were under notice; and he instructed them not to pay the money; and the account was frozen." Bloch considered the newspaper publicity sufficient notice to the brokers;

and declared that the proceeds from the sale of the stock would not be released to appellant "unless we get a release from the Government." He requested Mr. Howard to convey this information to his client. When informed of the brokerage firm's position, appellant, according to the witness, made "some expletive remark: 'Well, that is gone'—something to that effect."

The brief testimony of Attorney Bloch brought forward no new matter and was not contradictory, but partly corroborative, of the testimony of the broker, Smith, and that of Mr. Howard.

Appellant contends that his motion for a directed verdict should have been granted, because his answer to the crucial question upon which the indictment was based was "literally accurate, technically correct and legally truthful." He points out that about fifteen days before he made oath that he did not carry any brokerage accounts with any bond houses, he ordered the brokers to sell all his stock, close the account and send him the money; that the brokers complied by selling the stock on February 5, 1947, but wrongfully kept the money against his will and refused to turn it over to him. No other business having been transacted since the sale of the stock, he insists that he was not guilty of perjury in denying that he had a brokerage account on the 19th of February, 1947, inasmuch as the brokers intended to deliver to him the proceeds from the sale of the stock but upon advice of counsel decided not to do so and, eventually, turned over the money to the Internal Revenue Department. He insists that the question put to him upon which the indictment was based was not sufficiently definite; that he should have been questioned directly as to any "cash balance, monetary dealings or possession of any assets."

In overruling the motion of appellant for a directed verdict at the conclusion of the Government's proof, the court ordered stricken from the indictment the words, "or monies." From this, appellant argues that it was prejudicial error to refuse to order stricken from the indictment the phrase, "or to his credit with or in the hands of any brokerage firm at Toledo or elsewhere," and also the language that the defendant "well knew he had a credit or cash balance of $11,823.09 with the brokerage firm of Bell and Beckwith." Appellant says that these deletions should have been made by the court, for the same reason that the words "or monies" were stricken from the indictment.

He makes the additional point that, in view of the deletion of the words "or monies," the indictment was insufficient inasmuch as it fails to allege that "the defendant well knew on the day he so testified, that he carried such brokerage account," but recites, instead, that he "well knew he had a credit or cash balance of $11,823.09." This summarizes the contentions of appellant.

Appellant is right in his contention that there can be no lawful conviction in a perjury case when an answer of the defendant, under oath, to a question propounded to him is "literally accurate, technically responsive, or legally truthful." It is also true that, to sustain a conviction, it must be shown by clear, convincing and direct evidence to a moral certainty and beyond a reasonable doubt that the defendant committed wilful and corrupt perjury. The following cases, cited by appellant, sustain the contention. Hart v. United States, 9 Cir., 131 F.2d 59, 61; Fotie v. United States, 8 Cir., 137 F.2d 831, 840; United States v. Slutzky, 3 Cir., 79 F.2d 504, 505; Allen v. United States, 4 Cir., 194 F. 664, 668. It should be observed, however, that in Hart v. United States, supra, and in United States v. Slutzky, supra, convictions on the first count of the respective perjury indictments were reversed; but convictions of perjury on the second count were affirmed in both cases.

The acceptance of the doctrine of the strict requirement of convincing proof to justify convictions in perjury prosecutions was evidenced by this court in reversing a conviction of perjury in Galanos v. United States, 6 Cir., 49 F.2d 898, 899. There, upon the facts, it was found that the negative answer of the defendant, to the question whether he himself had arranged for the making of a bond for an arrested woman, was literally true. The proof showed that the defendant had participated with

others in preliminary negotiations eventually leading to the making of the bond, but that he, himself, had not in fact made the arrangements. It was held that his motion for an instructed verdict of acquittal should have been granted. Upon factual comparison of the Galanos case with this one, we find no similarity of such nature as to indicate that consistency requires like action here.

For illustrative cases in which this court has sustained convictions of perjury, see: Jacobs v. United States, 6 Cir., 31 F.2d 568; Laughters v. United States, 6 Cir., 155 F. 2d 29; Kahn v. United States, 6 Cir., 20 F. 2d 782.

■ It is, of course, for the court to determine, before submitting a perjury case to the jury, whether the quantitative rule of evidence has been satisfied. In Weiler v. United States, 323 U.S. 606, 65 S.Ct., 548, 89 L.Ed. 495, 156 A.L.R. 496, the Supreme Court held that, in order to convict in a prosecution for perjury, the falsity of the statement made under oath must be established by two independent witnesses, or by one witness and corroborating circumstances. This court had made a holding to the same effect before the announcement of the opinion of Mr. Justice Black in the Weiler case. See Fraser v. United States, 6 Cir., 145 F.2d 145, certiorari denied 324 U.S. 842, 65 S.Ct. 586, 89 L.Ed. 1403. We do not perceive that the Weiler case furnishes any guidance here. The false statement in this case made by appellant Smith under oath was proved, as has been shown, by the testimony of two witnesses: Norman Joss and Mrs. Alma White. The testimony of Willard Rutchow is also corroborative.

■ We cannot accept as valid the argument of appellant that his answer, "No, sir," to the question, "Do you carry any brokerage accounts with any bond houses?" was literally true. The truth or falsity of his answer must, of course, be judged by the facts existing at the time he gave the answer on February 19, 1947. Although his two hundred shares of General Motors stock had been sold by his order on February 6, 1947, the proceeds from the sale were not paid out but remained in the account to his credit on the books of the brokerage firm on the crucial date and, indeed, until June 26, 1947. Regardless of his instructions, the account had not been closed out on February 19, 1947, for the books of account of the brokerage firm show the uncontradicted fact that, on that date, appellant's account with the firm had a credit of $11,823.09.

■ As a practical matter, it is well known that a brokerage account is not considered to be closed as long as funds remain on the books of the broker to the credit of the customer. If the funds on deposit are sufficient, the customer may, through his broker, acquire stocks at any time, often by a mere order given by telephone; or the broker may, upon order of the customer, purchase and carry stocks for him on margin, if the deposit with the broker is sufficient to meet marginal requirements. The relationship between stockbroker and customer, as debtor and creditor, is well discussed in Hammon v. Paine, 1 Cir., 56 F. 2d 19.

No levy was issued by the Government against the money in appellant's account with Bell and Beckwith until June 25, 1947. During the interim between the sale of the stock and the levy, the brokerage firm was under no restraining court order or legal levy which prevented it from paying out the money to appellant. Refusal to pay was on the advice of the firm's own counsel and was not due to any court order or levy. The status of the account on February 19, 1947, and until June 26, 1947, was that of a "frozen" account. Although frozen, the account showed a credit of $11,823.09 to appellant. Therefore, his answer that he had no brokerage accounts with any bond houses on February 19, 1947, was not literally true.

■ Whether appellant wilfully and corruptly testified falsely was an issue for determination by the jury under appropriate instructions as to the applicable law.

For an illustrative authority as to the right of the jury in a perjury case to draw inferences from evidence, see Jacobs v. United States, 6 Cir., 31 F.2d 568, supra. In Epstein v. United States, 2 Cir., 271 F. 282, the court held that whether an alleged false statement was made with corrupt in-

tent is a question solely for the jury. In both these cases, convictions were sustained on appeal. See also United States v. Mascuch, 2 Cir., 111 F.2d 602, 603, holding the proof sufficient to support a finding by the jury that the defendant was guilty of perjury.

The District Judge carefully, correctly and adequately charged the jury upon the applicable principles of law and amply protected the lawful rights of appellant. The jury was instructed that the burden of proof rested upon the Government to establish beyond a reasonable doubt the truth of each essential element of the indictment. The essential elements were correctly defind. The court's explication of the ingredients of the crime was clear, correct and easily understandable. Among other instructions, the following were quite explicit: "The charge that the defendant did commit wilful and corrupt perjury in his answer to a question propounded by the authorized officer will not be established if the proof goes no further than to show that the defendant was honestly mistaken and in good faith believed his answer to be true. Also if you find from the testimony that the defendant's answers to the agent's questions were literally true, you cannot find him guilty of this charge. * * * If you shall find that the Government has proven beyond a reasonable doubt that the defendant did commit wilful and corrupt perjury in his answer to the revenue agent, and did give certain testimony which was material to the investigation then being conducted, and that he did make oath that the testimony would be the truth, the whole truth, and nothing but the truth, and that the defendant so being sworn did falsely testify on the 19th day of February, 1947, that he had no accounts to his credit with or in the hands of any brokerage firm in the City of Toledo, whereas, in truth and in fact he well knew that he had a credit or cash balance of $11,823.09 with a brokerage firm in Toledo, Ohio, and that said statement was made by the defendant for the purpose of defrauding and deceiving the Government in its efforts to satisfy an income tax claim against the defendant, then you should find the defendant guilty under this indictment. On the other hand if you should find that the Government has failed to prove these facts or any one or more of them beyond a reasonable doubt, then you must find the defendant not guilty. * * * The sole material question relied upon by the Government, and the sole answer which the Government claims to have been materially and wilfully false, were the question 'Do you carry any brokerage accounts with any bond houses?' and the answer 'No, sir.'" No exceptions to the charge were reserved.

In our judgment, the trial court properly denied the motion of appellant for a directed verdict and dismissal. We find no error in its rulings, instructions, or conduct of the trial.

The judgment of conviction and sentence is affirmed.

McALLISTER, Circuit Judge (dissenting).

While cheerfully acknowledging the profoundly thoughtful and scholarly consideration which has been given this case by Judge Martin, and the persuasiveness of the reasoning set forth in his opinion, I am yet unable to concur in his views and consider that the appellant was erroneously convicted; that the judgment should be set aside; and that the prisoner should be discharged.

There are certain salient facts and insinuating circumstances that compel me to this view, and to present them, I feel that a somewhat detailed account of the continuity of events and the background of the case is helpful. On February 19, 1947, in Toledo, Ohio, in a proceeding to discover assets of appellant before a Government agent acting under authority conferred by law, Smith, after being duly sworn as a witness, was asked: "Do you carry any brokerage accounts with any bond houses?"; to which he answered: "No, sir." Appellant was, thereafter, indicted for having "falsely testified that on the said date he had no accounts or monies to his credit with or in the hands of any brokerage firm in the City of Toledo, or elsewhere, whereas in truth and in fact, said defendant, J. Robert D. Smith, well knew he had a credit or cash balance of $11,823.09 with the

brokerage firm of Bell & Beckwith, in the City of Toledo, Lucas County, Ohio, said false statement having been made by said defendant, J. Robert D. Smith, for the purpose of defrauding and deceiving the United States Government, which, at the time of such examination and the false statement made had a claim against the said defendant J. Robert D. Smith, in a sum of money exceeding $100,000.00 of unpaid income taxes due and owing by the said defendant * * * to the United States Government."

It appears that for some time prior to February, 1947, Smith had carried a brokerage account with Bell & Beckwith Investment Company, in Toledo. He never had anything in the account except 200 shares of General Motors stock. On February 3, 1947, he ordered the broker to sell this stock and send him the money received therefor, and further ordered the broker "to close the account." On the next day, February 4, the broker sold the stock for $11,823.09 and deducted brokerage fees on the sale, but refused to send Smith the money.

The circumstances surrounding the refusal of the broker to turn over to Smith the proceeds of the sale are as follows: On the date of the sale of the stock, officials of the brokerage firm happened to read various newspaper articles concerning levies and warrants in distraint against Smith for unpaid federal income taxes. They thereupon called their attorneys for advice and, as one of the partners, a witness for the Government, testified, were told "to suspend activity in that account and freeze it," and to withhold payment of any money to Smith until there was a release by the Government. Counsel for the brokerage company further advised the members of the firm that the newspaper publicity was sufficient notice from the Government not to pay the money. On the same day that the officials of the brokerage company had received this advice from their lawyers, Smith and his attorney came to the brokerage company's office to get the money. A partner of the firm, appearing as a Government witness in the case, testified with respect to this interview as follows:

"Q. Do you not know as a matter of fact that both his attorney and Mr. Smith came to ask for that money? A. Oh, yes.

"Q. And of course you explained to them that due to warrants in distraint and levies, you were going to hold the money for the United States Government? A. That is right.

"Q. You further advised him he cannot get this money unless he gets a release from the United States Government? A. Right.

"Q. Your attorney, Henry Bloch, held conferences with his attorney, Eugene Howard? A. Right.

"Q. Now on the 19th of February, I believe you stated in answer to a question here that he had on deposit with you 11,000 and some hundred dollars. * * * A. My recollection of answering that question was the account showed a credit of $11,823.09, February 19, 1947.

"Q. But he could not draw it on February 19, 1947, could he? A. No, he could not.

"Q. He did come to draw it on the 6th of February and you refused to give it to him? A. That is right.

"Q. And it was on the 6th of February you told him that the Government has seized the money and that he cannot get it? A. Right.

"Q. Therefore, it is an assumption on your part that you had an account for him February 19, is that not right? A. We had that ledger sheet with J. Robert D. Smith in it. I did not say it was his credit. I said that account showed it.

"Q. You had $11,823 you were holding for the United States Government, but not for J. Robert D. Smith? A. We were holding it, I don't know for whom.

"Q. Well, whom did you give it to? A. The United States Government.

"Q. On the 6th of February you told him you were not going to give him the money; that it goes to the United States Government? A. As I understand the matter, we told him the account was frozen.

"Q. For the United States, for the Internal Revenue Bureau; therefore, on the

19th of February, you had no money in your possession that you were going to give to J. Robert D. Smith? A. No, sir."

On the trial, Smith's attorney testified that about two days after the stock was sold, he received a call from the attorney for the brokerage firm, who informed him that he had instructed the firm not to pay the money to Smith: "Mr. Bloch said to me, 'We will never release it unless we get a release from the Government.' Q. Did you convey that to Mr. Smith? A. I did. Q. Tell the court and jury the answer that Mr. Smith gave to you? A. In effect it was just some expletive remark: 'Well, that is gone'—something to that effect. Q. Meaning the money is gone? A. That is the impression I had."

The money received from the stock was turned over by the broker to the Internal Revenue Bureau about five months after the sale.

From the foregoing, it is my conclusion that Smith cannot be held guilty of perjury for having, on February 19, 1947, answered that he was not then carrying on a brokerage account with any bond house. At the time this question was asked of him, the Government had claims for unpaid taxes against Smith in excess of $100,000 and these claims, by way of levies and warrants in distraint, had been widely publicized for several months. Smith had been advised by his lawyer that the attorney for the brokerage firm had taken the position that, as to the money, the firm would "never release it unless we get a release from the Government." That would certainly mean to anyone in Smith's situation that he would never get the money; and that is obviously what it meant to Smith, when he 'said, on being informed of the brokerage company's stand: "Well, that is gone." Smith had been told directly by one of the partners of the brokerage firm that they "were going to hold the money for the United States Government"; "that the Government had seized the money and that he cannot get it"; and that the company would refuse to pay it to him. The partner, who told Smith these things, testified that he did not know whom the firm was holding the money for on February 19, the date of Smith's testimony, but that they had no money in their possession which they were going to give Smith. Counsel for the Government say that the testimony, above set forth verbatim, indicates, with respect to the statement made to Smith by the member of the brokerage firm—that the Government had seized the money and Smith couldn't get it—that this was merely an affirmative answer to a question including those elements, which was put to the witness by Smith's attorney. But the witness was a Government witness and such evidence is to be accepted at its face value if not explained or qualified. In any event, this specific portion of testimony is to the same effect as the bulk of the proof on this issue.

If what was told to Smith by the partner of the brokerage firm was true, Smith, literally, was not carrying any brokerage account with any bond houses at the time of his testimony on February 19, 1947. According to the uncontradicted testimony, the information given to Smith by the brokerage firm and by his counsel—who was merely repeating the advice given to him by the brokerage company and its lawyer—was notice to him that the money received from the sale of the stock was being held for the United States Government, that Smith had no right to it and no chance ever to get it; and that he believed and was justified in believing that, as to the money, it was "gone," as he remarked to his lawyer when told what the attorney from the brokerage company had said. There is no dispute that, even before this controversy arose, Smith had ordered his brokerage account closed upon the selling of the stock; and he was justified in believing that, when the stock was sold, the account was closed. The Government witnesses testified that Smith could not draw on the account after the sale of the stock.

Smith would be guilty of perjury only if he *willfully* testified to something which he did not believe to be true. Title 18 U.S.C.A. § 231. In order to constitute perjury, it must appear that the party knew that his statement was false at the time he testified. United States v. Richards, C.C.N.Y., 149 F. 443.

The Government contends that the question, "Do you carry any brokerage accounts with any bond houses?", was sufficiently

definite to ascertain whether a person had any monetary dealings with any brokerage house, and whether he had any credits or assets due him from a brokerage house. But the question, in this case, was in the present tense—and the brokerage account of Smith had been carried on only in the past, had been closed, and, as far as Smith knew, the money was being held for the Government or had already been seized by the Government. If the actual fact was that on the date of Smith's testimony, the money was being held for, or had been seized by, the Government, after the account had been closed, certainly it could not be said that subsequent to that time, Smith was carrying on a brokerage account with respect to such money.

In English law, the crimes of treason and perjury had the distinctive requirement, dating back several centuries, that they could be proved only by the testimony of at least two witnesses. See Wigmore on Evidence 3rd Ed., Sections 2036–2040. As to treason, the rule is similar to that appearing in Article III, Section 3, of the Constitution, in which it is provided that "No Person shall be convicted of Treason unless on the Testimony of two Witnesses to the same overt Act, or on Confession in open Court." As to proof of perjury, the Supreme Court, within the past few years, in its last pronouncement on the subject, in Weiler v. United States, 323 U.S. 606, 65 S.Ct. 548, 89 L.Ed. 495, 156 A.L.R. 496, adhered to the rule which bars a conviction of perjury on the uncorroborated testimony of a single witness. In doing so, it reversed a conviction for failure of the trial court to give a requested instruction to the jury to the effect that: "The Government must establish the falsity of the statement alleged to have been made by the defendant under oath, by the testimony of two independent witnesses or one witness and corroborating circumstances. Unless that has been done, you must find (the) defendant not guilty." At page 607 of 323 U.S., at page 549 of 65 S.Ct. This rule, of course, makes successful perjury prosecutions more difficult than they would be if subject only to the rule applicable to proof of other crimes; but it can be said that such a burden on perjury prosecutions well serves society. In order

that witnesses may be free to testify willingly, the law has traditionally afforded them this special protection. The rule is based upon the fear that innocent witnesses might be convicted in perjury prosecutions if a less stringent rule were adopted. Weiler v. United States, supra, 323 U.S. 606, at page 609, 65 S.Ct. 548. In the case before us, it is to be remarked that appellant testified at the request of the Government. He was informed by the income tax officials that he did not need to testify or give incriminating evidence against himself, but he waived his rights in this regard and willingly answered all questions propounded to him. Prosecutions for perjury, as a matter of public policy, have always been intentionally hedged about with difficulty in requirements as to the quantity of proof, as well as to the character of proof necessary to sustain a conviction.

If a person's answers to questions are legally truthful, he cannot be held for perjury. "The questions put to him must *search for the truth.*" (Emphasis supplied.) United States v. Slutzky, 3 Cir., 79 F.2d 504, 505. In the foregoing case, a witness was asked, on cross-examination, whether he had ever been convicted of a felony. He replied: "No." Actually, he had been convicted, in another state, of embezzlement and larceny, but according to the laws of that state, such crimes were not classified as felonies but as high misdemeanors. The court held that the answer of the witness was legally truthful and, in holding him not guilty of perjury in respect thereto, commented that the Government had framed its question badly. In perjury cases, the proof of the perjury must be as direct as the subject matter permits. Whenever the subject matter is in its nature susceptible of direct proof, circumstantial evidence will not support a conviction. United States v. Otto, 2 Cir., 54 F.2d 277.

In Galanos v. United States, 6 Cir., 49 F.2d 898, our court had occasion to consider this question, and there held the Government to the strictest degree of proof, and to a requirement of the most direct kind of evidence, of the falsity of testimony in perjury cases. In the Galanos case, it appeared that a number of defendants had been previously tried for conspiracy, and

that during the trial, one Gray was the chief witness for the prosecution. The testimony of the defendants in the conspiracy case was to the effect that the witness, Gray, and Steve Galanos were the real conspirators. Galanos was called as a rebuttal witness for the Government, and counsel for defendants, on cross-examination, sought to show such an interest of Galanos in protecting Gray as would indicate that the two were themselves associated in the conspiracy. It seems that Gray had been held as a material witness in an earlier related prosecution, and had been released upon bond. On cross-examination in the conspiracy case, Galanos was asked:

"Q. Don't you remember * * * when Helen Gray was being held as a witness and it was necessary to furnish a bond for her appearance to testify, that you made arrangements yourself for the making of a bond? A. I did not."

The fact was that the defendants in the conspiracy case had desired to procure the bond in question and had applied to a certain party, Dukas, who proposed to get it from a surety company by furnishing indemnity therefor. To do this, he demanded that the defendants indemnify him. But all the security which they could offer, was not sufficient for the purpose. They thereupon got Galanos to join them in indemnifying Dukas, and so procured the bond. On the appeal of Galanos from a conviction for perjury for his answer to the question as to arranging for the bond, the court said that the fact that Galanos participated with others in preliminary negotiations which eventually led to the making of the bond, and the fact that the testimony showed greater activity on the part of Galanos in instigating the plan to get the bond, only indicated his joinder with others indemnifying the person procuring the bond. It was held that Galanos' answer in the negative to the question, "Don't you remember * * * that you made arrangements yourself for the making of a bond?", was literally true. The court said: "Clearly he cannot be convicted of perjury merely because his literally accurate answer might have been somewhat modified in effect if he had been asked to state all of the circumstances. Perhaps, if he had been asked specifically,

he would have answered truly. The fact was that he did not 'make arrangements' *himself* for the making of a bond, but that Dukas made this arrangement."

The Galanos case is a stronger case than the one before us as to the requirement of specific questions in order to sustain a charge of perjury on the answers given by a witness under examination. For Galanos was the originator of the plan to get the bond. He showed greater activity than anyone else in instigating the scheme to get it; he participated in all the negotiations to that end; and he actually joined in indemnifying the surety, with the result that the bond was obtained. Yet the court held that his testimony was literally true that he did not make any arrangements himself for the making of the bond. In the instant case, appellant was asked, "Do you carry any brokerage accounts * * * ?" At that time, Smith had already ordered the account in question closed. The proceeds of the sale of stock were being held for the Government. Smith could not draw on the account. He had been told by the brokerage firm that he could not have the money, and also that the Government had seized it. While it was revealed on the examination of the witness for the brokerage company who testified as to the foregoing that there was some confusion in his mind whether the firm was holding the money for the United States Government or Smith, it is not disputed that the witness, acting for the broker, actually told Smith on February 6, 1947, that the broker was going to hold the money for the United States Government; that Smith could not get the money without a release from the Government; and that the Government had seized the money. An additional circumstance forcefully persuasive of the conclusion that Smith, literally, did not carry a brokerage account at the time of his examination, or consider that he carried such an account, is the fact that although he was desparately in need of money to raise a bond in another court proceeding at the time he sold the stock, and that he had ordered the stock sold for this specific purpose, he never attempted to draw the money or claim it after he had been told that the broker was going to hold it for the Government because of the warrants in distraint

and levies on account of his unpaid income taxes. The most that can be said with respect to the question asked by the Government agent as to whether Smith was carrying a brokerage account at the time of his examination, and his answer in the negative, is that it left the matter open to conjecture. As said in United States v. Slutzky, supra, the Government framed its question badly. It did not search for the truth, as such questions are required to do. If it were the intention to ascertain whether Smith had any cash or credits with brokers then or at any time prior to his examination, or whether he had ever carried a brokerage account, such questions could have been, and should have been, asked directly. If Smith had been asked whether he ever had General Motors stock, or any stock in the hands of Bell & Beckwith, or had engaged in any stock transactions during that month, or that year, he would have, perhaps, answered truthfully; or if he had been asked whether he had ever given orders to sell the stock, or what had happened to the stock, or the proceeds, he might well have told the investigator the plain truth. He did disclose, as hereafter appears, that he had purchased General Motors stock, but he was not asked what had happened to it. As was said by the court in Galanos v. United States, supra: "Perhaps, if he had been asked specifically, he would have answered truly." The alleged proof of perjury in this case cannot be said to be as direct as the subject matter permitted, and unless the proof is of such character, a charge of perjury cannot be sustained.

It is further argued by the Government that, in any event, perjury on the part of Smith is evident if certain of his other answers during the examination are considered together with his testimony respecting a brokerage account. In this regard, the Government agent asked:

"Do you have any recollection of buying any General Motors stock?

"None now.

"You never possessed any General Motors stock?

"Not in my name.

"Did you ever buy any for anybody else?

"Yes, for my mother."

Here, was revealed the purchase of the stock in question. It appears to be true that the stock had been assigned by Smith to the brokerage firm some time before its final sale. It was put in the broker's name "for the purpose of good delivery in case of sale or for safe keeping," which is a general practice in the brokerage business. The broker did not know whether or not anyone else had an interest in the stock. A charge of perjury, on this evidence, could not be sustained against Smith on the ground that he testified falsely that the stock was not in his name, or that he bought it for his mother. The main point of the inquiry in this respect was to find out whether Smith had ever bought any General Motors stock. He disclosed that he had. General Motors stock was the only stock Smith ever had in the brokerage account. Why was General Motors stock singled out and specifically asked about? The Government would seem to have known about the transaction, and, without more, it would appear reasonable to conclude that Smith assumed that it did know about it. This, however, is not necessary to decide. If the Government desired to find out what broker had acted as Smith's agent, and what his dealings with such broker were, or what had happened to the stock or the proceeds of any sale thereof, the questions to be asked were plain. But the Government came right up to what, under its present contention, seem to have been the crucial questions to be asked, stopped, dropped the inquiry, and immediately thereafter concluded the examination. Smith's disclosure that he purchased the General Motors stock, instead of strengthening the Government's case, undermines it.

One more consideration impels me to the conclusion that the conviction should be set aside. If it be assumed, as is held in the accompanying opinion, that Smith was actually carrying a brokerage account with a bond house on February 19, 1947, when he replied in the negative to the question, I am, nevertheless, of the opinion that there was not sufficient evidence of his guilt to warrant the submission of the case to the jury. To sustain the conviction, it must be shown by clear, convincing, and direct evidence, to a moral certainty and beyond

a reasonable doubt, that Smith willfully testified to something which he did not believe to be true. The evidence is undisputed that Smith was told by the broker that the money was being held for the United States Government; and that he could not secure it without a release from the Government—which, of course, he had no chance of getting, because of the Government's claim against him of more than $100,000. It is unquestioned that Smith could not draw the money from his broker. He was told that the account was frozen; that the Government had seized the money; and that he could not get it. It is, moreover, conceded that the attorney for the broker told Smith's attorney that the broker would never release the money until he got a release from the Government. Nowhere is it suggested that Smith could ever have gotten a release from the Government. There is no question that the counsel for the broker, a prominent attorney whose stand was adverse to the interests of Smith, believed that the broker was under notice of Government liens against Smith's property in his hands, because of the general notoriety of Smith's indebtedness to the Government, in spite of the fact that no specific order had been issued to the broker by the Government. Everyone in the case at the time Smith testified, including Smith's lawyer and the brokerage lawyer, considered that the broker was under notice of claim of lien by the Government, and that, accordingly, the broker could not—and certainly would not—pay any of the money to Smith without a release from the Government. Smith himself, having been advised by the broker that he could not have the money because it was frozen; that he could not draw on it; that the broker was holding it for the Government; and that the Government had seized it, had reason to believe that he had no further claim to the money. No one else in the case ever considered that Smith had any right to it after the broker had refused payment, and no one else considered that Smith could ever get the money, for the only possibility in that direction would be for Smith to satisfy, first, the Government's claim against him for $100,000—and that was impossible. The first occasion on which it seems to have been suggested that the money was available to Smith all the time, and that everyone was mistaken in thinking it was subject to the lien of the Government, was when Government counsel brought criminal proceedings against Smith, and scoffed at the idea that Smith could not have secured the money.

Under all of these admitted facts and circumstances, it seems only reasonable to conclude that Smith believed and considered that at the time he testified, he had no further claim to the proceeds of the stock sale; that they were actually being held for the Government; that he had no sum on deposit payable to him by the broker; and that he was not then, at that date, carrying any brokerage account with the firm. There is nothing in the entire case to contradict or cast doubt on such a belief on the part of Smith, and there is no suggestion, intimation, or insinuation from opposing counsel for the Government, that Smith believed that the account was not being held for the Government, or had not been seized by the Government, or that he had a right to the account, or that the money was still being held in his account and was payable to him. All the evidence in the case is to the contrary. This was the belief of Smith's lawyer, of the broker's lawyer—and Smith's belief is the crux of the case. For if he was of the same belief as the others, he did not willfully testify to something he knew to be false when he stated that, at the time he testified, he was not carrying any brokerage account with any bond house. In my opinion, there is no evidence to submit to the jury that Smith *willfully* testified to a falsehood in stating on February 19, 1947, that he was not carrying any brokerage account with any bond house, and no justification for a verdict that Smith was, beyond any reasonable doubt and to a moral certainty, guilty of willfully and corruptly testifying to something that he knew to be false.

It is said that it is too stringent a requirement to oblige the Government, in its examinations of taxpayers to discover assets, to be so meticulously specific in its questions in order to sustain a charge of perjury. But it is not an excessive demand that such an inquiry search for the truth.

It is easier for the Government to frame a question properly than it is for a man to serve three years in prison.

The conviction, in my opinion, should be set aside, the judgment reversed, and the case remanded for entry of a judgment discharging appellant.