Joseph George **BOUFFORD**, Defendant, Appellant,

v.

**UNITED STATES** of America, Appellee.

No. 5133.

United States Court of Appeals First Circuit.

Dec. 5, 1956.

Robert Shaw, Exeter, N. H., for appellant.

Maurice P. Bois, U. S. Atty., Concord, N. H., and William Maynard, Asst. U. S. Atty., Plymouth, N. H., on brief for appellee.

Before MAGRUDER, Chief Judge, and WOODBURY and HARTIGAN, Circuit Judges.

MAGRUDER, Chief Judge.

Joseph George Boufford stands convicted of an offense under 18 U.S.C. § 1015(a), and he appeals. An inspection of appellant's Record Appendix, and beyond that of the entire original transcript on file in this court, discloses many uncertain or confusing features about the case. The so-called briefs, of two pages and one page, respectively, filed by counsel for appellant and by the United States Attorney, have been of no help to us at all. Though ordinarily we would limit our consideration to points presented to the district court, or considered by it, and argued to us on appeal, we think this is an exceptional case where, in order to prevent a manifest failure of justice, we should vacate the judgment of conviction for a reason apparent in the record, though not presented by counsel for appellant either to the district court or to us

The statute under which Boufford was indicted, 18 U.S.C. § 1015(a), provides that

"Whoever knowingly makes any false statement under oath, in any case, proceeding, or matter relating to, or under, or by virtue of any law of the United States relating to naturalization, citizenship, or registry of aliens"

shall be fined not more than $5,000 or imprisoned not more than five years, or both. The indictment of Boufford charged as follows:

"That on or about August 4, 1953, Joseph George Boufford, did knowingly make a false statement under oath in a matter under a law of the United States relating to naturalization in that on an Application for a Certificate of Arrival and Preliminary Form for Petition for Naturalization executed by the said Joseph George Boufford under oath at Exeter in the District of New Hampshire he stated that he had been married but once when in fact as he well knew he had been married twice and had been convicted of bigamy."

Upon arraignment, the defendant pleaded not guilty. At that time the following colloquy occurred:

"The Court: Do you want to stand trial before a jury?

"Mr. Shaw [Counsel for defendant]: We are going to waive the jury, if it please the Court."

Nevertheless it does not appear that a jury trial was dispensed with in the formal way required by Rule 23(a) of the Federal Rules of Criminal Procedure, 18 U.S.C.A. At any rate, a jury was in fact impaneled, and sat through the whole of the trial, at the outset of which the district court stated: "We have a jury here now. We are going to put it before the jury. I don't care to try it myself. I don't think you can try it unless you have my approval. I mean, it requires the approval of the Court. We have drawn the jury, and that is the way it's going to be, unless there is something here that indicates that the matter should be dismissed."

The prosecution then called as a witness Walter J. Finnigan, an investigator for the Immigration and Naturalization Service. This witness identified as the application referred to in the indictment a document (Form N–400) entitled "Application for a Certificate of Arrival and Preliminary Form for a Petition for Naturalization" filed with the Service on August 4, 1953, by Joseph George Boufford of Newmarket, New Hampshire. The top half of page 2 of this application was received in evidence and marked as a Government Exhibit.

Question 22 on this exhibit read as follows:

"How many times have you ever been married? [Typed answer:] once How many times has your husband or wife been married? [Typed answer:] once If more than once, give date, place, name of spouse, and manner and date of termination of your marriages and marriages of your spouse

"[Space left blank]"

Witness Finnigan testified that in the course of his official duty he confronted Boufford with this application at some date subsequent to the date of its execution and obtained from Boufford the admission that the signature on the document was truly his. More particularly Finnigan inquired of Boufford as to the correctness of his answers "once" given in response to interrogatory No. 22.

It appears that Boufford was married in 1912 to one Josephine Demers; that this marriage has never been terminated; that he is still living in Newmarket, N. H., with his wife Josephine; that in 1925 when Boufford was in the National Guard in New York he went through a ceremony of marriage with a girl down there, as a result of which he was tried and convicted of bigamy in a New York state court.

▮ Finnigan testified that in answer to a question why the applicant had not disclosed in his response to interrogatory 22 the fact of this second marriage in 1925, Boufford replied that it was "because I was afraid that if I also showed I was arrested for bigamy in New York in 1925 and had been married twice that I would be deported and also hurt my chances of becoming a citizen if I was not deported."

At the conclusion of Finnigan's testimony the government rested. Counsel for the defendant indicated that the defense was not going to offer any evidence, but he did make a motion for a judgment of acquittal, as provided in Rule 29(a) of the Federal Rules of Criminal Procedure.

This motion for a judgment of acquittal was based upon the proposition that as a matter of law Boufford's answer "once" to the inquiry as to how many times he had ever been married was a truthful answer to the question as framed, for the ceremony of marriage which Boufford went through in 1925 did not result in the creation of the legal status of wedlock with the New York girl, in view of the provision of § 6 of the New York Domestic Relations Law, McKinney's Consol.Laws, c. 14, to the effect that a "marriage is absolutely void" if

contracted by a person who has a husband or wife by an earlier, though still subsisting, marriage.

Of course this motion for judgment of acquittal called for a ruling of law by the trial judge. If he accepted the legal point urged by the defendant, and directed a judgment of acquittal, that would have been an end of the case; for if the defendant did not make a "false statement," as charged in the indictment, he could not be convicted of "knowingly" making a false statement. See Smith v. United States, 6 Cir., 1948, 169 F.2d 118, 121. On the other hand, if the trial judge denied the motion for a judgment of acquittal, then the question of the accused's guilt or innocence would have to be determined by the jury, under appropriate instructions, unless a jury trial was dispensed with as provided in Rule 23(a).

At the close of the evidence the trial judge addressed the jury as follows:

"* * * I am not going to submit this case to you on a finding of fact or for your determination. As I view the state of the record and the statute and the indictment, I think it is a straight question of law. The facts are conceded. There isn't any question of fact here. And so, it being a straight question of law and wholly a question of law, I am going to take it upon myself to decide the guilt or innocence of this respondent, because I think it resolves itself only to matters of law, which are not for the jury in any event; that is, for any decision on the part of the jury.

"And so, without objection on the part of either the Government—or to put it this way: with the consent of the Government and counsel for the respondent, I am going to take the matter under advisement and render a verdict that I think should be rendered in view of the applicable law that is involved in this case."

Subsequently, in announcing his disposition of the case, the district judge stated his conclusion to be that the defendant did knowingly make a false statement under oath in his application for citizenship, and he accordingly found the defendant guilty as charged, and proceeded to adjudge that the imposition of sentence be suspended and the defendant be placed on probation for a period of two years. See Korematsu v. United States, 1943, 319 U.S. 432, 63 S.Ct. 1124, 87 L.Ed. 1497. In his statement of reasons for this conclusion, the judge pointed out that two elements must be present in order to establish a violation of 18 U.S.C. § 1015(a): "The first, intent, is admitted by defendant, and is not in dispute. The second, the making of a false statement, is denied, and is the only point of controversy in this case." [145 F.Supp. 533.]

As to the second element, the making of a false statement, the judge reasoned that the word "married" as used in question 22 "refers to the ceremony as well as to the state of wedlock. The purpose of the Government in asking the question was undoubtedly to discover what possible legal obligations, liabilities and relationships the applicant for citizenship may have contracted in the past. This includes all of his involvements in valid, voidable, and void marriages or the marriage ceremony. And though the defendant was married only 'once' in the sense that he had entered into only one valid state of wedlock, it is also true that he was married 'twice' in that the second marriage ceremony, though a nullity, could give rise to certain legal responsibilities."

■ Conceding that the point is not free from doubt, we think upon the whole that the district judge's ruling as to the meaning of the question put in interrogatory 22 was correct, and that no error was committed in the refusal to grant the defendant's motion for a judgment of acquittal (which was the only ground of reversal urged on appeal). The question, put as in this case to an unschooled layman, could hardly have been intended to elicit a lawyer's technical answer. In many cases, whether a second marriage ceremony results in the creation of a new state of wedlock may depend upon the

validity of a prior divorce decree, a matter which even a lawyer may sometimes not be sure about. Indeed, on the face of the New York statutory provisions, it is apparent that the word is used as referring to the ceremony of marriage rather than to the creation of a state of wedlock. Section 6 of the Domestic Relations Law of New York, which appellant stresses so much, says a *"marriage is absolutely void"* [italics added] if contracted by a person who has a spouse living. And § 340 of the New York Penal Law, McKinney's Consol.Laws, c. 40, provides that a "person who, having a husband or wife living, *marries* another person, is guilty of bigamy * * *." [Italics added.] In the leading case of Commonwealth v. Mash, 1844, 7 Metc. (Mass.) 472, the conviction of a woman for bigamy was sustained where she went through the form of a second marriage less than seven years after her husband had disappeared, though she honestly believed at the time of the second ceremony that he was dead. Chief Justice Shaw stated at page 473:

"It appears to us, that in a matter of this importance, so essential to the peace of families and the good order of society, it was not the intention of the law to make the legality of a second marriage, whilst the former husband or wife is in fact living, depend upon ignorance of such absent party's being alive, or even upon an honest belief of such person's death. Such belief might arise after a very short absence. But it appears to us, that the legislature intended to prescribe a more exact rule, and to declare, as law, that no one should have a right, upon such ignorance that the other party is alive, or even upon such honest belief of his death, to take the risk of marrying again, unless such belief is confirmed by an absence of seven years, with ignorance of the absent party's being alive within that time."

See also Cornett v. Commonwealth, 1909, 134 Ky. 613, 121 S.W. 424; State v. Zich-

feld, 1896, 23 Nev. 304, 46 P. 802, 34 L.R.A. 784.

Therefore, we agree with the district court that the answer "once" was not a correct answer to the question as properly interpreted.

■ It seems to us, however, that in a case of this sort the prosecution has to establish not only that the defendant made a "false statement under oath", but also that he "knowingly" made such a false statement. Thus if it appeared that the defendant could have believed, in good faith, upon advice of counsel, that the response he made to question 22 was a true statement, and was all that the inquiry called for, then it could not be said that he "knowingly" made a false statement, as charged in the indictment. This inquiry as to the defendant's subjective state of mind may present a typical issue appropriate for determination by a jury.

The inquiry "How many times have you ever been married?" contains a possible ambiguity. The interrogatory goes on to state that, if the answer to the question is "more than once, give date, place, name of spouse, and manner and date of termination of your marriages". This reference to the "date of termination" of plural marriages might plausibly be urged to refer to the legal state of wedlock, rather than to a void ceremony of marriage.

At any rate that seems to have been what Boufford's lawyer advised him was the meaning of question 22. The following colloquy occurred in the cross-examination of government witness Finnigan:

"XQ. Now you also know, or you are aware, that this application that Mr. Boufford submitted was made out by myself, isn't that right?

"A. I didn't know that until today.

"XQ. But you know it; you know that I filled in those answers for him?

"A. You mentioned that."

Of course neither defendant nor his counsel Shaw testified that the answers

in the application signed by Boufford were inserted by the lawyer, in accordance with what he interpreted the questions to mean. No doubt the witness Finnigan's statement to that effect was based merely upon hearsay. But the statement was admitted in evidence, without objection, and we suppose that the defendant upon a new trial might very well be able to present competent evidence of the fact that the defendant executed the application after the answers to the questions had been inserted by the lawyer, and upon the lawyer's assurance that the answers truthfully disclosed what the inquiries, properly interpreted, called for.*

We are unable to understand what the district court could have meant in saying that the first element necessary to be established by the prosecution in this case, namely, "intent, is admitted by defendant, and is not in dispute." Of course, the defendant intended to subscribe to the answers given in the application, and to file the application. But, so far as we are aware, the record is devoid of any concession that the defendant "knowingly" made a false statement.

We suppose that the district judge may have had reference to Boufford's statement, to which the witness Finnigan testified, that he had not disclosed his bigamous marriage in making his answer to question 22 because he was afraid that that disclosure would prejudice his chances of being naturalized. That certainly is not necessarily an admission that the defendant had "knowingly" made a false statement. Under all the circumstances, a jury might reasonably

have found such statement to be no more than an explanation by Boufford of the reason why he was relieved that a truthful answer to question 22, as that question was interpreted by his lawyer, could be made without volunteering such a disclosure.

A judgment will be entered vacating the judgment of the District Court and remanding the case to that Court for further proceedings not inconsistent with this opinion.

---

* One of the reasons why the case has been difficult for us to understand is that, though the truncated exhibit in the case does not disclose it, we know judicially that the application form in question (N–400) asked many other questions, including the question whether the applicant had ever been convicted for violation of any law or ordinance, and if so, to state the particulars. If the defendant gave a truthful response to this question and disclosed his conviction in

New York in 1925 for the crime of bigamy, such disclosure would tend to indicate that he had not intended his answer "once" to question 22 to be misleading. If, on the other hand, the defendant answered "never" to the question whether he had ever been convicted of an offense, then we wonder why he was not charged with perjury in connection with that answer, instead of being subjected to such a dubious prosecution as the present one.