ANDERSON *v.* NELSON, WARDEN.

No. 652, Misc.   Decided April 1, 1968.

*Charles A. Legge* for petitioner.

*Thomas C. Lynch,* Attorney General of California, for respondent.

PER CURIAM.

Petitioner Anderson was convicted after jury trial in California courts of forgery and the State District Court of Appeal affirmed, finding all errors nonprejudicial under the State's harmless error rule.   After the California Supreme Court returned to petitioner unfiled his petition for hearing in that court, with the notation that it was not timely, petitioner sought habeas corpus relief in Federal District Court.   The District Court issued the writ, holding that the prosecutor's comment on the failure of petitioner to testify at his trial, made in violation of *Griffin* v. *California,* 380 U. S. 609, was not harmless error.   The State appealed.   One week after oral argument, our decision in *Chapman* v. *California,* 386 U. S. 18, was handed down.   Applying the *Chapman* standard, the majority of the Court of Appeals concluded that the *Griffin* error was harmless "beyond a reasonable doubt." *Wilson* v. *Anderson,* 379 F. 2d 330, 335.   Judge Ely dissented.

We agree with Judge Ely that comment on a defendant's failure to testify cannot be labeled harmless

error in a case where such comment is extensive, where an inference of guilt from silence is stressed to the jury as a basis of conviction, and where there is evidence that could have supported acquittal. We find this is such a case.

The bookkeeper for a trucking firm had written a $196 payroll check to employee Michael Pittman and had placed it in the firm's office. The check disappeared at a time either shortly before or after petitioner was in the firm's office asking for a job. Two days later petitioner had possession of the check and asked gasoline station operator Kernen to cash it for him. According to Kernen, petitioner told him he had been working for the trucking firm and it was his payroll check. Kernen was acquainted with petitioner, knew him as Willy, and knew he was the brother of Jim Anderson, who had a charge account with Kernen. Kernen told petitioner he did not have enough money on hand to cash the $196 check, but they agreed to apply $112 to Jim Anderson's account, with petitioner taking $84. According to Kernen's testimony, petitioner then borrowed a pen from him and endorsed the name Michael Pittman on the check. When the check was returned to Kernen by the bank, he met with police and identified petitioner from a police "mug shot."

The arresting officer testified that he asked petitioner about the incident and that petitioner admitted cashing the check but denied he endorsed it. Petitioner told the officer he was in a bar when an unknown person came up to him and said he wanted to cash a check. Petitioner took it to the service station and substituted $112 he had on his person for the amount withheld by Kernen.

Petitioner did not testify and presented no evidence. The trial court instructed the jury on inferences to be drawn from petitioner's silence as follows:

"As to any evidence or facts against him which the defendant can reasonably be expected to deny or

explain because of facts within his knowledge, if he does not testify . . . the jury may take that failure into consideration as tending to indicate the truth of such evidence and as indicating that among the inferences that may be reasonably drawn therefrom, those unfavorable to the defendant are the more probable."

It is conceded that those instructions violated *Griffin.* It is also conceded that the prosecutor's comments* violated *Griffin.*

While the evidence against petitioner was sufficient to convict, the facts that petitioner allegedly forged the name Michael Pittman in the presence of an acquaintance of petitioner's who knew him as Willy, the brother of Jim Anderson, that petitioner allegedly chose to cash a worthless check at a place where he was known and openly agreed to have the major portion of the proceeds applied to his brother's account and yet, after all this, did not flee the county could be viewed as casting doubt on the prosecution's case, perhaps on Kernen's veracity. In this posture, we cannot say that the prosecutor's extensive argument asking the jury to overlook inferences favorable to petitioner because he invoked his constitutional right not to testify was, in the words of *Chapman,* "harmless beyond a reasonable doubt." 386 U. S., at 24. Since petitioner is entitled to relief for this reason, we do not reach the other questions he seeks to raise. Nor are we persuaded by respondent's contention that petitioner's late filing of a petition for hearing in the State Supreme Court constituted a deliberate bypass of state remedies, precluding him from habeas corpus relief in federal courts. See *Fay* v. *Noia,* 372 U. S. 391. Cf. *Henry* v. *Mississippi,* 379 U. S. 443.

---

*See the Appendix to this opinion.

The motion for leave to proceed *in forma pauperis* and the petition for a writ of certiorari are granted and the judgment is

*Reversed.*

MR. JUSTICE BLACK and MR. JUSTICE HARLAN would affirm the judgment of the Court of Appeals.

## APPENDIX TO PER CURIAM.

The prosecutor stated in argument:

"Now, one other thing the Judge will instruct you— he told you—he touched on this when we were picking the jury: The defendant, as Mr. Anderson has done, in a criminal case, he doesn't have to take the stand. That's his choice. He can take the stand if he chooses. He doesn't have to. I can't call him to the stand; the Judge can't demand that he get on the stand. That's completely up to him. He is not required to, under our law, to testify.

"The Judge will also instruct you that the jury may consider that, because of his failure to testify, that if he had certain facts which would be expected to be within his knowledge, that he could explain or deny certain things, that the jury may consider this. In other words, by that I mean such as in this case, Mr. Anderson could have gotten on the stand and told you, 'No, I didn't sign that,' or, 'I wasn't up to the Calverts [trucking firm] and somebody else told me about it, as I told Sergeant Sonberg [the arresting officer].'

"In other words, you can consider that, when a person could be expected to know something about something, and he doesn't tell you what obviously he must know, why, then you can draw certain inferences from that.

"And, as I say, ladies and gentlemen, there is no evidence on behalf—that the defendant has put in here.

"So, the only way we can be attacked is that we haven't proven case, we haven't made out a case because of certain suspicions or inferences or something like that, showing there was another man, or something like that. That hasn't been testified to here.

"Now, you can't guess as to what Mr. Anderson would or would not have testified to if he did get on the stand, because you haven't heard it. You will have to base your decision on those documents and the people you have heard here. If you don't believe any of them, you will probably not find him guilty; but if you do believe them—there has been no contradiction, nobody has contradicted them at all—then you are only led to one conclusion, and that simply is the fact that the defendant is the one that passed that check, and is guilty here.

"Remember, you have no conflicting evidence on the other side. You either would have to disbelieve the Calverts, Michael Pittman, and Mr. Kernen and Sergeant Sonberg and the rest of them.

"No one came in and said, 'No, that isn't it; he was somewhere else.' You heard nothing like that, ladies and gentlemen.

"There hasn't been any evidence that has been produced to controvert it. Nobody has come in here and told you Mr. Anderson was somewhere else, or he didn't do it, or he didn't come up and get that check, and 'I didn't know anything about it, and I went in there innocently to pass it.' He didn't tell you that at all.

"I give him credit for not getting up on the stand and trying to tell you a lie. At least he had the ability to sit there and not say anything, rather than try to get up and tell you a whole lot of hogwash. I'll at least give him that much credit.

"There is some disputed evidence that Mr. Anderson showed up with this check and passed it on Kernen on the 29th.

"Now, if he got it some innocent way, if somebody gave it to him, that he didn't know, then he should have gotten up on the stand to tell us about it. And don't you think if that is what happened, he would have? I would; you would. You would beat a path to that stand, at least to get up there and tell them what happened. But that isn't the situation here.

"Now, we don't know what Mr. Anderson's story is, because you haven't heard it.

"That's what he told Sergeant Sonberg, three completely phony, different versions of it.

"You didn't see him get up, you didn't hear the words from him, because he didn't get up on the stand. You don't know what his story may be today. He might have told you another story, that he was flying around up in Alaska, or something like that. I don't know."