**UNITED STATES of America**

v.

**Samuel BRONSTON, Defendant.**

**No. 69 CR 696.**

United States District Court,
S. D. New York.

April 15, 1971.

See also 321 F.Supp. 1269.

Whitney North Seymour, Jr., U. S. Atty., for S.D.N.Y., for plaintiff; Walter M. Phillips, Jr., Asst. U. S. Atty., of counsel.

Orans, Elsen & Polstein, New York City, for defendant; Sheldon H. Elsen, New York City, of counsel.

## MEMORANDUM

TENNEY, District Judge.

The defendant, Samuel Bronston, having been tried before a court and jury and found guilty of one count of perjury in violation of Section 1621 of Title 18 of the United States Code, moves pursuant to Fed.R.Crim.P. 29 for judgment of acquittal or, in the alternative, for a new trial under Fed.R.Crim.P. 29 and 33.

Count one of the indictment [1] in substance charges that Mr. Bronston knowingly testified falsely before a referee in bankruptcy in an arrangement proceeding conducted pursuant to Section 21, sub. a of the National Bankruptcy Act, 11 U.S.C. § 44, in order to conceal the existence of a personal bank account previously maintained by him in Geneva, Switzerland.

Before considering the arguments of counsel in support of this motion, it would be useful to set forth the questions and answers which are the subject of count one.

1. Q. Do you have any bank accounts in Swiss banks, Mr. Bronston?

   A. No, Sir.

2. Q. Have you ever?

   A. The company had an account there for about six months, in Zurich.

---

1. The defendant was tried upon a two-count indictment and, acquitted of the charge in the second count.

3. Q. Have you any nominees who have bank accounts in Swiss banks?

A. No, Sir.

4. Q. Have you ever?

A. No, Sir.

It is not disputed that movant's responses to questions 1, 3 and 4 were in all respects truthful. However, the response given to the inquiry as to whether he had ever had a Swiss bank account (question 2) was, although perhaps literally true, unresponsive to the question posed. The Government argues, as it did at trial, that this constituted a flat denial of ever having personally maintained a Swiss bank account.

In moving for judgment of acquittal, the defense urges that as a matter of law such testimony cannot be perjurious. The Government, on the other hand, contends with equal vigor that an unresponsive answer may be perjurious if tantamount to a willful attempt to conceal the truth.

After considering movant's numerous arguments set forth in meticulously prepared papers in support of these motions, the Court, for reasons to be noted *infra*, is constrained to deny the motions and permit the jury's verdict to stand.

Analysis of the issues raised on the Rule 29 motion for judgment of acquittal must necessarily begin with close scrutiny of the questions posed to the defendant. To be sure the interrogation was most inept; but this only begs further inquiry as to whether question number 2 was misleading or incapable of eliciting a single honest answer, or whether the defendant could consciously have taken advantage of the situation by giving an unresponsive answer in order to avoid disclosure of his Geneva account.

■ It is well settled that a person may not lawfully be convicted of perjury unless the question put to him adequately tests his belief in the truthfulness of his response. United States v. Wall, 371 F.2d 398, 400 (6th Cir. 1967). This is essentially because perjury is a highly personalized crime, conviction for which is to a great extent dependent upon proof of the accused's belief in the truthfulness of his sworn testimony. United States v. Winter, 348 F.2d 204, 210 (2d Cir.), cert. denied, 382 U.S. 955, 86 S.Ct. 429, 15 L.Ed.2d 360 (1965).

■ Thus, assuming as we have, that the questioning of the defendant was less than skillful, it nevertheless seems plain that the question—"[h]ave you ever" had a Swiss bank account?—admits of but a single interpretation calling for a simple yes or no answer. This question is patently not misleading and readily susceptible to a truthful and responsive answer. Movant unavailingly cites Galanos v. United States, 49 F.2d 898, 899 (6th Cir. 1931), wherein the Court of Appeals for the Sixth Circuit reversed a perjury conviction and noted that "[p]erhaps, if * * * [the defendant] had been asked specifically, he would have answered truly". In the instant case, after Mr. Bronston replied negatively to the question—"Do you have any bank accounts in Swiss banks * * * ?"—he was specifically asked: "Have you ever?". Thus, in plain unambiguous language the defendant was specifically asked the crucial question to which he evasively replied. The distinction between Galanos, supra, and the instant situation is thus apparent and unworthy of further comment. Moreover, since a 21–A examination is in the nature of a "fishing expedition" [2] conducted for the purpose of locating assets of the debtor, there is no duty upon the examiner to rephrase each question, or to warn the witness to testify truthfully. It is in fact the bankrupt and not the interrogator who would have exclusive knowledge of the whereabouts of his assets. As noted by Judge Weinfeld in United States v. Winter, supra, 348 F.2d at 210, "[o]nce a witness swears to give truthful answers, there is no requirement to 'warn him not to commit perjury or, conversely to

2. Trial transcript (hereinafter referred to as "Tr.") of Jan. 27, 1971 at 90.

direct him to tell the truth.' It would render the sanctity of the oath quite meaningless to require admonition to adhere to it."

Similarly inapposite is the situation that existed in United States v. Wall, *supra*, 371 F.2d at 399, wherein the defendant denied having "ever been on trips with Mr. X". The indictment charged that this testimony was perjurious in that the defendant "had been on a trip with Mr. X in Miami Beach, Florida * * *." In response to defense counsel's inquiry at a hearing before the district court, as to what the words "on a trip" meant, the government attorney in substance replied that it could mean either that one person accompanied another some place or that two persons were at a particular place together. On appeal, the court of appeals indicated that the evidence at trial, although improperly received, clearly demonstrated that the defendant did not accompany Mr. X to Miami Beach. Although there was competent and sufficient evidence to establish that the accused and Mr. X were in Miami Beach together, the conviction below was reversed, the court noting that "the question upon which the perjury charge was based, was inarticulately phrased * * [since it] was susceptible of two different interpretations". United States v. Wall, *supra* at 399–400.

It seems clear that the question posed to the defendant herein did not admit of different plausible interpretations and was sufficiently precise to test the accused's belief in the truthfulness of his answer. Cf. United States v. Wall, *supra* at 400; United States v. Lattimore, 127 F.Supp. 405 (D.C.D.C.), aff'd, 98 U.S. App.D.C. 77, 232 F.2d 334 (1955).

I am also not persuaded that the district court's rulings in United States v. Cobert, 227 F.Supp. 915 (S.D.Cal.1964), compel a conclusion to the contrary. Indeed, in language similar to that used in *Cobert, supra,* at 919, the jury was instructed that if they found that "the defendant did not understand a particular question put to him by the questioner and therefore gave a non-responsive answer, that answer cannot be perjurious, [since] [o]ne cannot wilfully state a falsehood in response to a question he does not understand." [3] The jury was further charged, although admittedly with an emphasis on count two, that if "the questions were less precise than they should have been, this * * * [should not] be permitted to prejudice the defendant".[4] In the instant case, the jury must have rejected any contention that the defendant's non-responsive answer resulted from a misunderstanding of the simple question put to him; that is, his response must have been considered by the jury as one that reflected perjury and not a misunderstanding. See United States v. Sweig, 316 F.Supp. 1148, 1164 (S.D.N.Y.1970).

■■ Movant further urges that an acquittal is warranted under the holding of United States v. Slutzky, 79 F.2d 504 (3rd Cir. 1935), wherein the court noted that the questions put to the accused must search for the truth, and reversed a conviction because the answer which was the basis of the perjury indictment was technically and actually *responsive* and correct. The critical and controlling distinction between the response in *Slutzky, supra,* and the one given herein, is that while Mr. Bronston's answer may have been truthful, it was not responsive. Thus, although a truthful and responsive answer may not be perjurious, a technically truthful but unresponsive one may. Again, the jury was specifically instructed on this point.[5] From the foregoing it seems clear that movant's answer to the second question was not "literally accurate, technically responsive, or legally truthful" within the meaning of Smith v. United States, 169 F.2d 118, 121 (6th Cir. 1948); accord,

3. Tr. Feb. 2, 1971 at 12.

4. *Id.*

5. *Id.* at 13.

United States v. Wall, *supra,* 371 F.2d at 400; *see* Galanos v. United States, *supra,* 49 F.2d at 899.

I similarly reject defendant's contention that the holding of Fotie v. United States, 137 F.2d 831 (8th Cir. 1943) requires that a judgment of acquittal be entered on count one. Although the language from *Fotie* cited by movant is indeed strong, the facts underlying the reversal therein significantly undercut the thrust of the defendant's argument. In response to inquiries as to whether he ever swore that he was born in Italy or ever applied for naturalization papers in the United States, the defendant in substance answered negatively but qualified his response by stating that he did not remember. Fotie v. United States, *supra* at 842. Thus, in order to establish the guilt of the accused it was incumbent upon the Government to establish that he remembered filing a declaration of intention to become a citizen, in which he swore that he was born in Italy. When shown an original and duplicate of his declaration, filled out approximately 24 years prior to the examination which formed the basis of the indictment, he promptly admitted the genuineness of the document and that the signature thereon was his. He denied, however, any recollection of placing his signature thereon. Inasmuch as the issue was not whether he had in fact filled out the application, but rather whether he remembered doing so some 24 years before, the conviction on this count was reversed since there was no proof of anything other than that the act not remembered did in fact occur. Fotie v. United States, *supra* at 842.

Thus, while in *Fotie, supra,* the alleged perjury was based upon a defendant's denial of remembering an oath made by him 24 years prior to the questioning upon which the indictment was based, the situation herein involves a Swiss account which existed only two years prior to the interrogation and which was active four years prior thereto. Moreover, Mr. Bronston never disclaimed knowledge of ever having personally maintained a Swiss account; but, rather, he unresponsively and perhaps evasively answered that his company had one. I do not suggest that in the instant case mere proof of the existence of the account would suffice to sustain the conviction; rather I wish to place in proper perspective the amount of recall at issue in each case.

Finally, with regard to defendant's motion for judgment of acquittal, the Court must consider whether the facts from which the jury could have inferred the defendant's state of mind were sufficiently proved by direct evidence. United States v. Remington, 191 F.2d 246, 249 (2d Cir. 1951), cert. denied, 343 U.S. 907, 72 S.Ct. 580, 96 L. Ed. 1325 (1952). Initially it should be noted that the waiver of bank secrecy, the document so heavily relied upon by movant which was executed in 1965, could have been considered by the jury as direct evidence that when it was executed the defendant was aware of the existence of his Geneva account. The jury could thus have further inferred that he remembered this account when he was questioned in 1966. In addition, although the account was closed for two years and dormant for two more prior thereto, there was direct proof that while the account was active it was used extensively for personal and business transactions. (Indeed, the jury requested that the exhibits of the cancelled checks be furnished them during their deliberations.) Further, the fact that the defendant unhesitatingly recalled that he presently had no Swiss accounts or nominees with such accounts, but remembered that his corporation had one in Zurich for about six months, could properly have been considered by the jury as direct evidence from which they could infer that movant was familiar with, and remembered his foreign financial affairs. Finally, since the cancelled checks in evidence were, for the most part, substantial in amount, this is also direct evidence which could suggest or at least permit the inference that when the defendant was questioned before the

referee, he was aware of the existence of the account.

Defendant alternatively moves for a new trial under Fed.R.Crim.P. 33,[6] based upon the prosecution's allegedly improper and prejudicial summation. Central to his argument herein is the contention that a key issue for the jury on count one was whether the defendant kept his Geneva account secret from his principal creditor Pierre duPont III. That part of the Government's summation placed in issue by the defense is as follows:

> "He never said in that waiver, 'I have an account at the International Credit Bank in Geneva. I have a specific account.'
>
> He just says, 'Any accounts that I may have', and he also lists a whole slew of companies.
>
> Mr. Elsen says, 'Well, Mr. duPont knew about it.'
>
> How did Mr. DuPont know about it? By this one document? This is the document they seem to rely on, where the account was started after $75,000 was transferred to the Chase Manhattan Bank.
>
> First of all, there is nothing that says [sic] here anything about the International Credit Bank except Bank Redint. If you are pretty well knowledgeable in these cable addresses then you know, then you can trace it, that that is the International Credit Bank. But there is nothing in that document that says that he opened an account there and there is nothing in any document that the defendant has produced that says that he opened an account there.
>
> There is no way that Mr. duPont would have known about this. And if Mr. duPont had known about this, why did it take him until 1968 to find out about it? You recall the waiver

was signed in 1965. It was in August of 1968, two years after he testified and lied about it, that Mr. duPont's representative went to the bank and ascertained that there did exist in fact a bank account there, or had, in Mr. Bronston's name.

Mr. Elsen, the defense has called all these witnesses, peripheral witnesses, to establish that Mr. duPont knew about this. Why not call Mr. duPont —there has been no evidence that he is not alive and well and living in Wilmington right now—if you want to prove that Mr. duPont knew about this." [7]

Initially, it should be noted that at trial defense counsel's only serious objection to the Government's summation was made after the assistant, in effect, commented upon the defendant's failure to testify, by stating that "Mr. Bronston didn't state anything to you [the jury]." [8] In response to this objection, the prosecution argued that it made this statement in reply to that part of defense counsel's summation which suggested that the defendant had in fact testified. The record is clear that counsel for movant did, although perhaps inadvertently, state: "Mr. Bronston, as he told you, in his mind * * * considered the Spanish Government to have first claim. * * *" [9]

■ When the prosecutor's comments are balanced against those of defense counsel and it is considered that the government attorney followed his comment about Mr. Bronston's not stating anything to the jury by explaining that what the defendant allegedly said was "stated to the officials whose depositions you [the jury] heard",[10] it seems plain that this aspect of the summation does not fall within the proscription of the Supreme Court's rulings in Anderson v. Nelson, 390 U.S. 523, 88 S.Ct. 1133, 20 L.Ed.2d 81 (1968); Chapman v. Califor-

---

6. Defendant also moves for a new trial under Fed.R.Crim.P. 29, but since there is no issue of credibility this motion is also denied.

7. Tr. Feb. 1, 1971 at 92–94.

8. *Id.* at 100, 104–06.

9. *Id.* at 79.

10. *Id.* at 100.

nia, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); and Griffin v. California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). Furthermore, although not in the language suggested by the defendant, the Court instructed the jury that the defendant had a constitutional and legal right not to testify and that exercising this right could in no way be considered against the defendant.[11]

Before refocusing our attention on that part of the government summation quoted above, certain other observations must be made. First with regard to the prosecution's rhetorically asking "[w]hy not call Mr. duPont—there has been no evidence that he is not alive and well and living in Wilmington right now—if you want to prove that Mr. duPont knew about this,"[12] the Court noted that "[t]he only evidence on Mr. duPont was improperly injected by * * * [the prosecution] in the course of * * * [its] summation",[13] and instructed the jury that "even if Mr. duPont was equally available to both sides, no inference can be drawn against the defendant because Mr. duPont was not called".[14] In addition, the jury was instructed that since there was "evidence that Mr. duPont was hostile to the defendant * *, cooperating with the prosecution * * * [and] could have been called by the government * * * [the jury could] draw an adverse inference against the government from the failure of the prosecutor to call him."[15] Of course, the jury was further charged that anything said by counsel for the Government or defense "with respect to matters in evidence, whether during the trial, in argument or in summation, is not evidence in the case."[16]

Thus, although it was improper for the Government to offer testimony as to the whereabouts of Mr. duPont, I am confident that the Court's charge with regard to this matter sufficiently warned the jury not to accept the Government's unsworn testimony about duPont as evidence that if he were called he would deny any prior knowledge of the Swiss account in issue.

Movant's final two objections to the Government's summation allege that the prosecutor prejudicially distorted the chronology of events leading up to the discovery of the Geneva account and that the prosecution incorrectly stated that the defense failed to produce evidence that duPont knew of the opening of the account in Geneva. Since these objections were not interposed at the close of the Government's summation and no protective instructions were sought, doubtless defendant could be deemed to have waived these objections. United States v. Aadal, 368 F.2d 962, 965 (2d Cir. 1966), cert. denied, 386 U.S. 970, 87 S.Ct. 1161, 18 L.Ed.2d 130 (1967); United States v. Johnson, 331 F.2d 281, 282 (2d Cir.), cert. denied, Pheribo v. United States, 379 U.S. 905, 85 S.Ct. 196, 13 L.Ed.2d 178 (1964). In any event, careful consideration of the merits of these arguments belie their validity. Although the Government admittedly did not go through the chronology of events before the Geneva account was opened, with the same precision defense counsel has in his memorandum of law submitted in support of this motion, the Government's statements were a fair prosecutorial summary of record evidence which could support a conviction. The Government is not obliged to dwell in its summation upon matters which will mitigate the thrust of its proof. Inasmuch as the waiver of secrecy was given the creditors in 1965,[17] assigned to Mr. duPont in June of 1967,[18] after which time he appointed Mr. Michael Stern his attorney in fact,[19] and the account was in fact finally discovered in August of

---

11. Tr. Feb. 2, 1971 at 26–27.

12. Tr. Feb. 1, 1971 at 94.

13. Tr. Feb. 2, 1971 at 31.

14. *Id.* at 27.

15. *Id.*

16. *Id.* at 28.

17. Def.'s Exh. B.

18. Def.'s Exh. C.

19. Def.'s Exh. D.

1968,[20] it was neither unfair nor improper for the Government assistant to state that if Mr. duPont knew about the account when it was opened why did it take him until 1968 to discover it.

█ Moreover, since the defendant contends that Mr. duPont, as his principal creditor, knew about the existence of the account since 1959, when it was opened, it was not improper for the prosecution to hypothetically ask the jury why it was not until two years after Mr. Bronston denied having such an account that Mr. duPont's representative finally discovered it.

I find naive defendant's specific criticism of the prosecution for not referring to those defense exhibits which would indicate that Mr. duPont was in fact aware of the opening of the account. More specifically, I find untenable and reject movant's claim that a new trial is warranted because the Government incorrectly stated in its summation that there was no evidence that duPont knew about the account. Perhaps if this inaccurate comment were uncontradicted by the trial exhibits and testimony, and defense counsel's summation, a different result would be reached. That is, even though the Government's statement that "there is nothing in any document that the defendant has produced that says that he opened an account there," [21] is inaccurate and contradicted by the evidence,[22] it does not run afoul of any authority cited by movant or discovered by the Court.

Finally, it must be noted that defense counsel's summation specifically dwelt on the testimony and exhibits relative to duPont's knowledge of the existence of the account.[23] That the jury perhaps did not think it relevant whether duPont knew of the existence of the account, or did not send for defendant's exculpatory exhibits, is unfortunate for the defense,

but it by no means follows that the jury was unaware of the existence of the exhibits or was convinced by the Government's inaccurate statements that there was no such evidence.

█ Lastly we consider defendant's motion for an acquittal or a new trial under Fed.R.Crim.P. 33 based upon the Government's alleged deprivation of exculpatory evidence from the defense. Assuming for purposes of this motion that the following facts, as summarized from the affidavit [24] filed in support of this motion are true, the Court finds the relief requested unwarranted and denies movant's request for a hearing on this issue.

On November 16, 1970, defense counsel met in London, England, with the defendant and Irwin Margulies, Esq., a former New York attorney who represented Mr. Bronston in the past. After showing Mr. Margulies various correspondence and cables relating to the opening of the Geneva account, he (Margulies) indicated that he remembered the transaction, apparently since he introduced Mr. Bronston to the bank and arranged the discount, and that he had told Mr. duPont all that he knew about the matter.[25] In addition, the three men discussed loans made by Mr. Margulies to the defendant through the Dorchester Establishment.[26] In response to an inquiry, defense counsel assured Mr. Margulies that his personal financial affairs would not become involved in the event that he testified on Mr. Bronston's behalf.[27] Admitting a preference to being deposed rather than attending trial, Mr. Margulies nevertheless agreed to come to testify after his New York attorney, Benjamin Poznansky, Esq., reviewed the matter.[28] On January 21, 1971, ten days after the trial was originally scheduled to commence, the defense learned that

20. Tr. Jan. 27, 1971 at 79–80.

21. Tr. Feb. 1, 1971 at 93.

22. *E. g.*, Def.'s Exhs. I and J.

23. *Id.* and Tr. Feb. 1, 1971 at 57–60.

24. Affid. of Sheldon H. Elsen, Esq. (dated March 16, 1971).

25. *Id.* at ¶¶ 7–10.

26. *Id.* at ¶ 11.

27. *Id.* at ¶ 12.

28. *Id.* at ¶ 13.

Mr. Margulies was too ill to come to New York and that Mr. Michael Stern, a person closely associated with the prosecution in this case, had spoken to Mr. Margulies. Mr. Stern was the person sent by Mr. duPont to Geneva to examine the records of Mr. Bronston's account. It further appears, although the significance and relevance of this escapes the Court, that Mr. Burnand, counsel for the Geneva bank who testified on behalf of the prosecution, was called by the Zurich lawyer who presented the Geneva bank with the waiver of secrecy, and was requested to come to New York to testify. Mr. Burnand was further advised that Mr. duPont would pay his travel expenses. On the advice of the Geneva bank's New York counsel, Mr. Burnand insisted that the Government reimburse him for his expenses.[29]

Returning to the events of January 21, when it was learned that Mr. Margulies was too ill to come to New York, movant advised the prosecution of its intent to seek leave to depose Mr. Margulies in London. The defense was told by the government attorney that Mr. Margulies had recently called Mr. Stern and informed him that he was requested to come to New York and testify, but before he did so he wanted assurance that there would be no inquiry into his own personal financial affairs. Mr. Stern apparently gave no such assurance.[30]

According to the defendant, and since a hearing is being denied, for purposes of this motion it will be deemed true, on January 24, 1971 Mr. Margulies told defense counsel that Mr. Stern had frightened and shocked him during their telephone conversation by confidently talking about the investigations "we" are conducting and the people "we" are going after.[31] Mr. Margulies apparently believed that Stern and the investigations were financed by "duPont money" and

that Stern was part of a team working for duPont and the Justice Department.[32] Mr. Margulies was further told by Stern that duPont was "out to get" a number of people who had been associated with Mr. Bronston and apparently believed that if he testified on the defendant's behalf he would be one of those investigated and/or prosecuted by the Government.[33] However, and of great significance herein, is the fact that Mr. Margulies informed movant, and this is not disputed, "that his medical reason for not coming was bona fide".[34] A medical certificate was sent to counsel and is in fact annexed to defendant's affidavit filed in support of this motion.[35] It would be well to pause and note herein that this factor alone vitiates any argument that but for Mr. Stern, Mr. Margulies would have appeared and testified at the trial.

On January 22, 1971, the day after movant learned that Mr. Stern spoke to Mr. Margulies, and was granted permission to take Mr. Margulies' deposition and again delay the trial, counsel for the defense called Mr. Margulies in London who seemed reluctant to assist Mr. Bronston, but nevertheless agreed to a deposition on condition that his attorney, Mr. Poznansky, be present.[36]

Since Mr. Poznansky's passport had expired, and he could not obtain an emergency renewal, it was impossible for him to travel to London. As a result thereof and as a "substitute" condition for the deposition, a stipulation dictated by Mr. Poznansky was signed by defense counsel giving Mr. Poznansky veto power over the defendant's use of the deposition. Also at the insistence of Mr. Poznansky, counsel for movant agreed to limit his inquiry to the events precipitating the opening of the Geneva account.[37]

On January 23, 1971, the defense met alone with Mr. Margulies, who stated in response to a question about what he told

29. *Id.* at ¶ 22.
30. *Id.* at ¶ 25.
31. *Id.* at ¶ 41.
32. *Id.*
33. *Id.*
34. *Id.* at ¶ 43.
35. *Id.* and second unnumbered exhibit annexed to Affid. of Sheldon H. Elsen, Esq. (dated Mar. 16, 1971).
36. *Id.* at ¶ 28.
37. *Id.* at ¶ 32.

duPont in October of 1959 about the opening of the Geneva account, that he only informed him of the terms of the note which was discounted when the account was opened. After being confronted with various documents presumably to refresh his recollection, he admitted that he must have told Mr. duPont about the opening of the account. It will be noted that at the ensuing deposition he only admitted telling duPont about the terms and discounting of the note.[38] At this interview, Mr. Margulies refused to discuss the Dorchester transactions, and asked counsel for movant how he knew of his conversation with Mr. Stern. Mr. Margulies further stated that he wished to avoid getting personally involved in the investigation. At this point he also indicated that he feared that Mr. Stern was working with the prosecution and would have implicated him if he testified in New York.

At the deposition on January 23, 1971, the following matter concerning this situation was put on the record:

"Now I will state for the record that Mr. Margulies has advised me that in a telephone conversation with Mr. Michael Stern, who states that he is employed by Mr. duPont, that if Mr. Margulies gave testimony that he would have his personal affairs dragged into the mud. This type of threat, which I restate only under the circumstances, under the conditions of this lawsuit, would otherwise not have been brought in, is relevant in considering the situation which we now face. We have the situation of a witness who has according to statements to me been threatened and regardless of whether the witness has anything relevant or not to be concerned about in any other context, there is no possible basis upon which he can be harassed at this examination by inquiry into his personal affairs on matters collateral to this lawsuit, which have nothing to do with the direct testimony. I again call upon Mr. Phillips to reserve for this matter the ruling of the Court and to complete any other questions which he may have to complete the record." [39]

The next day, the defense again met with Mr. Margulies who stated his version and the effect of his telephone conversation with Mr. Stern. As indicated *supra*, for purposes of this motion the Court has considered this as true.

Upon return from London, movant furnished the Court with a copy of the transcript of the deposition and enclosed a transmittal letter advising the Court that "The defendant expects to offer the deposition in its entirety, except for those questions, objections and answers adduced on cross-examination when an effort was made to inquire into Swiss bank accounts of the witness." [40]

Again we must pause to note that conspicuously absent from this letter is the slightest hint of any of the issues raised herein.

It appears that Mr. Poznansky consented to the use of the deposition provided that no applications were made to have further questions put to the witness.[41]

In denying the requested relief and a hearing on the issues presented herein, it must be re-emphasized that Mr. Margulies could not have been a witness at the trial. In addition, we must note that although the deposition was not as exculpatory as defendant claims it would have been, Mr. Margulies did in fact give testimony favorable to the accused. The resulting situation is therefore that the defendant was allegedly deprived of a more exculpatory deposition.

Movant contends that the deposition was withdrawn and not offered at trial because Mr. Margulies' refusal to testify about Dorchester would have prejudiced his case. This contention is presently rejected as untimely,[42] since the defend-

---

38. *Id.* at ¶ 36.

39. *Id.* at ¶ 38 and Transcript of Deposition of Irwin Margulies, Esq. at 16 (dated Jan. 23, 1971).

40. Letter from Sheldon H. Elsen, Esq. (dated Jan. 26, 1971).

41. Affid. of Sheldon H. Elsen, Esq. at ¶ 47 (dated Mar. 16, 1971).

42. *Id.* at ¶ 48.

ant could have offered the deposition reserving his objections to the Government's inquiry as to Dorchester. I further reject the self-serving excuse that if the deposition were received with the Dorchester matter excised, the defendant's case would still have been prejudiced because of his failure to explain these transactions via Mr. Margulies; first, because he originally did not object to the introduction of evidence relating to Dorchester,[43] and, second, because the Dorchester issue was subsequently abandoned at trial and never mentioned in either summation.

It must next be considered the "less exculpatory deposition" did not in a strict sense deny the defense of any significant evidence. The matters sought to be brought out on the deposition by the defense were for the most part cumulative of record evidence,[44] and matters eloquently explained and emphasized to the jury on summation.[45]

That Mr. Poznansky imposed a limitation on the defendant's scope of inquiry and insisted on a veto power over the use of the deposition is of little moment since prior to the alleged threats by Mr. Stern, Mr. Margulies indicated that he "wanted to have the matter [his testimony] reviewed by his New York attorney, Benjamin Poznansky, Esq. * * "[46] Moreover, since the Dorchester issue was abandoned at trial, it is equally irrelevant that movant was precluded from inquiring into this matter. And since Dorchester also appears to have been a personal financial matter to Mr. Margulies,[47] it would seem that by his assurances in November of 1970, movant's counsel agreed not to pursue such an issue. Although Mr. Margulies spoke freely about this matter in front of Mr. Bronston and his attorney in November, nothing in the moving affidavit suggests that he was willing to testify about it.[48] Presumably, the November conversation was not being transcribed—nor was Mr.

Margulies under oath and subject to cross-examination.

I also wish to re-stress the fact that after the deposition was completed the defendant never raised the issues discussed herein; rather, he merely withdrew the deposition from evidence. The Court does not dispute that in the conference in chambers on January 22, 1971, I indicated a strong disinclination to further delaying this trial, but this does not excuse defendant's complete failure to bring such extraordinary accusations to the Court's attention until several weeks after the trial has concluded. A criminal trial is not a game of chance wherein one may keep an "ace in the hole" in the event his client is convicted. Certainly movant's letter of January 26, 1971, wherein he indicated his intention to offer the deposition into evidence did not put the Court on adequate notice of the events underlying the deposition.

Finally, and with equal force, movant is reminded that the testimony that he sought to elicit was, in addition to being cumulative of other record evidence, completely collateral to the central issue in the case. Even if the jury were convinced that Mr. duPont was at all times fully aware of the existence and opening of the Geneva account, this would be no defense to the charge that Mr. Bronston willfully concealed this fact during his 21-A examination. The charge is perjury—not concealment of a bank account from Pierre duPont III.

I conclude, therefore, that movant is entitled to none of the relief requested and am not persuaded that Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); Bray v. Peyton, 429 F.2d 500 (4th Cir. 1970); Gregory v. United States, 125 U.S.App.D.C. 140, 369 F.2d 185 (1966), cert. denied, 396 U.S. 865, 90 S.Ct. 143, 24 L.Ed.2d 119 (1969); Hernandez v. Nelson, 298 F. Supp. 682 (N.D.Cal.1968), modified on

---

43. Tr. Jan. 29, 1971 at 3–4.

44. Def's. Exhs. I and J.

45. Tr. Feb. 1, 1971 at 57–59.

46. Affid. of Sheldon H. Elsen, Esq. at ¶ 13 (dated Mar. 16, 1971).

47. *Id.* at ¶¶ 11–13.

48. *Id.* at ¶ 11.

other grounds, 411 F.2d 619 (9th Cir. 1969), the principal cases cited by movant, compel a conclusion to the contrary.

Accordingly, and for the foregoing reasons, defendant's motions are in all respects denied.

So ordered.