Hugh NAUGHTEN, Petitioner-Appellant,

v.

Hoyt C. CUPP, Superintendent, Oregon State Penitentiary, Respondent-Appellee.

No. 71–3065.

United States Court of Appeals, Ninth Circuit.

May 24, 1972.

As Amended on Denial of Rehearing Jan. 18, 1973.

Dissenting Opinion Feb. 26, 1973.

Certiorari Granted April 23, 1973. See 93 S.Ct. 1926.

---

Ross R. Runkel (argued), Salem, Or., for petitioner-appellant.

John W. Osburn, Sol. Gen. (argued), Jim G. Russell, Asst. Atty. Gen., Lee Johnson, Atty. Gen., Salem, Or., for respondent-appellee.

Before JERTBERG, ELY, and HUF-STEDLER, Circuit Judges.

ELY, Circuit Judge:

Naughten is an Oregon state prisoner, convicted of the offense of armed robbery. His direct appeal in the Oregon state courts was unsuccessful. State v. Naughten, 90 Adv.Or. 1811, 471 P.2d 830 (App. 1970). Eventually, Naughten filed a petition for habeas corpus in the court below, and he now appeals from the denial of that petition.

██ In the state court trial, the judge, over Naughten's objection,[1] instructed the jury as follows:

> "Every witness is presumed to speak the truth. This presumption may be overcome by the manner in which the witness testifies, by the nature of his or her testimony, by evidence affecting his or her character, interest, or motives, by contradictory evidence, or by a presumption."

Such an instruction has been almost universally condemned. *See* United States v. Birmingham, 447 F.2d 1313 (10th Cir. 1971); United States v. Stroble, 431 F. 2d 1273 (6th Cir. 1970); McMillen v. United States, 386 F.2d 29 (1st Cir. 1967), cert. denied, 390 U.S. 1031, 88 S. Ct. 1424, 20 L.Ed.2d 288; United States v. Dichiarinte, 385 F.2d 333 (7th Cir. 1967); United States v. Johnson, 371 F.2d 800 (3d Cir. 1967); United States v. Persico, 349 F.2d 6 (2d Cir. 1965). *See also* United States v. Safley, 408 F. 2d 603 (4th Cir. 1969); Harrison v. United States, 387 F.2d 614 (5th Cir. 1968); Stone v. United States, 126 U.S. App.D.C. 369, 379 F.2d 146 (1967). In Stone v. United States, *supra*, Judge, now Chief Justice, Burger, wrote:

> "[This instruction] has a tendency to impinge on the presumption of innocence. Lurking in such an instruction is the risk that the jury might conclude that they were required to accept the testimony of the prosecution's witnesses at face value, particularly when it is not contradicted by other witnesses."

379 F.2d at 147.

---

1. The fact that Naughten made a timely objection to the instruction deserves emphasis. Absent such an objection, he would be in no position to challenge it. This is because, in the circumstances of a particular case and because of other contents of the instruction, an accused's attorney might appropriately deem it strategically advantageous to the accused that the instruction be given.

In the state court trial, Naughten did not testify, nor did he present any witnesses in his defense. Thus, the clear effect of the challenged instruction was to place the burden on Naughten to prove his innocence. This is so repugnant to the American concept that it is offensive to any fair notion of due process of law. *See* Bentley v. Crist, 469 F. 2d 854, 855 n. 2 (9th Cir. 1972).

The appellee contends that other of the court's instructions offset the vice of the instruction that we have quoted. We do not agree, for there was no instruction so specifically directed to that under attack as can be said to have effected a cure.

The appelleee also contends that the instruction, even if fatally defective under the federal constitution, was, in the circumstances, harmless beyond all reasonable doubt. Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed. 2d 705 (1967). We reject this argument also. Once Naughten established the infringement of a constitutionally protected right, the burden shifted to the appellee to establish that the error was harmless under the *Chapman* standard. From our examination of the transcript of the trial proceedings, we conclude that the appellee could not, in this case, meet the burden. *Cf.* Anderson v. Nelson, 390 U.S. 523, 88 S.Ct. 1133, 20 L. Ed.2d 81 (1968).

Naughten is entitled to a new trial; therefore, upon remand, the District Court will hold the petition in abeyance for a reasonable period, not to exceed sixty days, so as to afford Oregon the opportunity to reprosecute Naughten should it choose to do so.

Reversed and remanded.

### ORDER ON PETITION FOR REHEARING

The court amends its original opinion in the subject case as follows:

(1) The insertion of a footnote reference [1] after the word "objection," the last word of the first line of the second paragraph of the slip opinion of May 24, 1972.*

(2) The addition of a footnote [1] reading as follows: "The fact that Naughten made a timely objection to the instruction deserves emphasis. Absent such an objection, he would be in no position to challenge it. This is because, in the circumstances of a particular case and because of other contents of the instruction, an accused's attorney might appropriately deem it strategically advantageous to the accused that the instruction be given."

The court's original opinion having been thus amended, the panel as originally constituted has voted to deny the petition for rehearing and to reject the suggestion for *en banc* rehearing.

The full court has been advised of the suggestion for *en banc* rehearing and has been advised of the foregoing amendments to the court's original opinion.

A judge in active service having requested that a vote be taken on the appellee's suggestion for *en banc* rehearing, such a vote has been taken. Fed. R.App.P. 35(b). Judges Chambers, Koelsch, Wright, Trask, Goodwin, and Wallace would have granted *en banc* rehearing, and Judge Chambers wishes it recorded that he presently intends to write and file, at a later date, a separate opinion explaining his views.

The other six judges in active service voted to reject the suggestion for *en banc* rehearing. The vote being equally divided, the suggestion for *en banc* rehearing is rejected.

CHAMBERS, Circuit Judge (dissenting):

Naughten was charged with robbing a Quickie Mart drive-in grocery store in Portland, Oregon, on August 17, 1968. The evidence at trial consisted of the testimony of James R. Livengood, the proprietor of the store, the testimony of

---

* Editor's Note: The changes have been made in the original opinion.

Larree E. Weissenfluh, a friend of Livengood who was in the store with Livengood, and the testimony of the officers who arrested Naughten and investigated the crime.

Livengood testified as follows:

The store closed at midnight. Around midnight on August 17, 1968, Livengood was in the store preparing the till change for the next morning. Livengood's friend Weissenfluh was in the store partly because Livengood did not like to be in the store alone late at night. The store was well-lighted, even after closing, since several of the banks of lights were left lighted all night. There were large glass doors at the front of the store.

At approximately 12:10 a man entered the store, brandished a pistol and said, "This is a holdup." The robber took three stacks of currency from the counter top where Livengood was working. There had been 21 $1. bills, 9 or 11 $5. bills, and 3 $10. bills. The robber told Livengood to open the safe. Livengood opened the safe, and the robber removed a small, brown paper grocery bag filled with quarters from the safe.

The bandit ordered Livengood and Weissenfluh to the rear of the store to a walk-in cooler. After they had been in the rear of the store a short time, Weissenfluh said, "He's gone." Livengood went to the front of the store, but the robber was still there. The robber ordered Livengood to get back to the rear of the store and stay there or the robber would use the pistol. The robber put the pistol to Livengood's head and directed him to the rear of the store, threatening to pistol-whip him if he did not obey.

After a moment, Weissenfluh said, "He's gone, I'm sure he's gone this time." Livengood went up front again, got his pistol from under the counter, and looked for the robber. The robber was gone. Livengood went out front and saw the robber in the parking lot of a tavern across the street for only a brief moment.

Livengood called the police and reported the robbery, then stayed on the telephone watching the parking lot across the street. He saw a car leave, then another that appeared to be driven by the robber. A police car pulled up at that moment and stopped the car pulling out of the parking lot. Livengood went over to the car and identified the driver as the robber. He was not wearing the overcoat he had worn in the store, and Livengood did not see the pistol.

Livengood described the robber's pistol as being about six inches long, .22 calibre, and old and worn. Livengood said that the robber wore dark trousers, a light-colored shirt, and an overcoat. The robber was about two to three feet away from Livengood. The robber was in the store a total of fifteen minutes, and of that time Livengood observed him all but two or three minutes.

Livengood identified Naughten at trial as the robber. The prosecutor asked, "Is there any doubt in your mind?"

Livengood responded, "None whatsoever."

On cross-examination, Livengood denied that he had viewed any lineups or any photospreads containing pictures of Naughten. Livengood denied talking about the case with anyone except for answering some questions for the deputy district attorney the day before the trial. Livengood admitted being with Weissenfluh the evening before his testimony, but denied discussing the case except to wonder how long it would last. Livengood said that he had never before testified in a case.

Weissenfluh testified as follows:

He was a shipping clerk, not employed at the Quickie Mart. On the night of the robbery he had been visiting with Liv-

engood at the store since about 10:00 p. m. They planned to have a few beers after closing. At about 12:10, Weissenfluh was standing in front of the glass doors when Livengood said, "Turn around." When Weissenfluh turned, he saw a man with a gun who said, "Don't move." The robber picked up the money from the counter, put it in his coat pocket, then ordered Livengood to open the safe. The robber reached into the safe and removed something Weissenfluh could not identify.

The robber then marched Weissenfluh and Livengood to the cooler that covered the back wall. Weissenfluh thought he could see the store from the cooler and said, "He's gone." They both ran up front to get Livengood's pistol. The robber was not gone. The robber marched them back to the cooler with pistol in Livengood's neck. He threatened to pistol-whip Livengood.

Weissenfluh and Livengood waited until the robber left, then went up front. Livengood grabbed his gun from under the counter, Weissenfluh took it from him while Livengood got on the phone and called the police. Weissenfluh fired two shots at the fleeing robber. The robber went to a tavern parking lot across the street and Weissenfluh lost sight of him.

Weissenfluh saw one car leave the lot across the street, then the car apparently driven by the robber. Livengood described the car with the robber in it to the police over the telephone. Just as the robber's car was emerging from the lot, two police cars arrived and arrested the three occupants. Weissenfluh identified the driver as the robber. Although Weissenfluh could only see the head of the driver of the car, he had no difficulty in identifying him. As Weissenfluh said, "When someone sticks a gun in my ribs, I don't forget their face."

Weissenfluh testified that the robber wore slacks, shirt and tweedy sport coat or car coat. He identified the pistol as a long-barreled .22 calibre. When the prosecutor asked Weissenfluh if the robber were in the court, Weissenfluh identified Naughten.

"Q  Is there any doubt in your mind?

"A  No, there's not, no doubt whatsoever."

On cross-examination, some inconsistencies developed between Livengood's testimony and Weissenfluh's. Livengood had testified that he had seen Weissenfluh at the police station when he went to sign a complaint. Weissenfluh denied ever having been in the police station. Weissenfluh stated that he had spent the night before testifying in Livengood's hotel room. (Livengood had moved away from Portland.) Livengood had testified that they had only played pool the evening before. Livengood testified that he wanted Weissenfluh in the store for protection late in the evening. Weissenfluh said he was only there because he and Livengood were going to have a few beers later in the evening.

In addition to Weissenfluh and Livengood, two uniformed police officers and one detective testified. The officers testified that they had received a radio call to go to the Quickie Mart since there was a robbery in progress. They received a description of the car that Livengood thought he had seen the robber driving. As the officers arrived, they saw a car matching the description pull out of the tavern parking lot across the street. They pulled over the car and arrested all three occupants. One of the men identified Naughten, the driver, as the robber. Naughten was placed in the rear of one of the police cars. One of the officers saw Naughten attempting to conceal money in the crack of the seat of the police car. Naughten had his hands cuffed behind his back, and he was pulling the money from his right rear pants pocket and stuffing it into the crack. The officers seized the money

**850**

and found 21 one dollar bills, eleven five dollar bills, and three ten dollar bills.

Naughten was not wearing a coat, and a search of him and the car he was driving revealed no pistol. However, in searching the parking lot, the officers did find a bag of quarters near the rear door of the tavern.

A detective on the case was not able to add much except to identify the clothes taken from Naughten the night of the robbery, and to testify that he had ordered the store dusted for fingerprints.

Naughten offered no witnesses in his own defense.

From the foregoing we see precious little discrepancies in the testimony— only the slight variances that tend to confirm veracity of two witnesses to the same event.

. Obviously, under Chapman[o] v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L. Ed.2d 705 (1967) and Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969), we can say beyond a reasonable doubt the alleged error was harmless.

In a case so harmful to delicate state-federal relations we ought to take the case en banc. Cf. Leiter Minerals v. United States, 352 U.S. 220, 77 S.Ct. 287, 1 L.Ed.2d 267 (1957).

It is clear the federal courts now on direct appeal, where objection was made timely in lower courts, usually reverse on the instruction. But I am unconvinced that the point rises to constitutional dimensions. The inept instruction obviously comes from Mathes and Devitt, Federal Jury Practice and Instructions § 72.01 (1965), and we must assume it has been given thousands of times.

This sort of thing should be left to the states when it is a state case.

ALFRED T. GOODWIN, Circuit Judge, concurs in the foregoing expressed dissent.