STATE of Maine

v.

Bryan D. INGALLS.

Supreme Judicial Court of Maine.

Argued June 8, 1988.
Decided July 25, 1988.

Paul Aranson, Dist. Atty., Laurence Gardner (orally), Deputy Dist. Atty., Anne B. Judd, Asst. Dist. Atty., Portland, for plaintiff.

David P. Silk (orally), Portland, for defendant.

Before McKUSICK, C.J., and WATHEN, GLASSMAN, SCOLNIK and CLIFFORD, JJ.

McKUSICK, Chief Justice.

After a jury trial in Superior Court (Cumberland County) defendant Bryan Ingalls was convicted of Class A robbery (17–A

M.R.S.A. § 651(1) (1983)) and Class C possession of a firearm by a felon (15 M.R.S.A. § 393 (1980)). On his appeal defendant contends that the prosecuting attorney in closing argument twice impermissibly commented on his refusal to testify at trial and also contends that the evidence presented at trial was insufficient to support the jury's verdict. We find no merit in defendant's sufficiency of the evidence contention or characterization of one of the prosecuting attorney's statements as a comment on defendant's failure to testify. Although the other statement made by the prosecuting attorney could be understood as an ambiguous reference to defendant's failure to testify, we find it harmless error and affirm the judgment.

## I.

On January 12, 1987, a man wearing a brown ski mask and blue ski jacket robbed the Puffin Stop convenience store on the corner of Route 302 and River Road in Windham. For at least one half hour before the robbery, the store cashier and store manager watched a man wearing a blue ski jacket standing across the street from the store but were unable to see his face clearly. The manager watched the man cross the street and walk to the side of the store. When the manager walked out of the store to see what the man was doing, the man dove behind an ice machine at the side of the store. Minutes later a man entered the store with his face covered by a brown ski mask. He was wearing a blue ski jacket with orange lining and two tears in the fabric. The man placed a rifle against the manager's cheek and demanded money. After taking the paper money from the cash drawer, the robber left the store and ran down River Road. After checking the store receipts, the manager determined that $222 in bills had been taken, with about $50 of that amount in one dollar bills.

The police very promptly arrived and began their investigation. A woman who had been driving down River Road just after the robbery reported to the police that a man with his face covered by a brown ski mask had run away from Puffin Stop along

River Road and turned off onto a side road or driveway. A police officer drove down River Road and stopped to talk with Janet Winslow who lives approximately one half mile from the Puffin Stop and was shoveling snow from her driveway. Mrs. Winslow told the officer that she had not seen anyone run by and agreed to call the police if she saw anything suspicious. About ten minutes after talking with the police officer, Mrs. Winslow saw a man walk out onto River Road from beside the Ingalls house that stands closer to the Puffin Stop than her house, and start to hitchhike toward Portland away from the Puffin Stop. Mrs. Winslow immediately called the police and reported that the man had been picked up by someone driving a white car.

An officer on River Road heard the dispatch and stopped the white car. Defendant was the only passenger in the white car which was being driven by a woman. He was carrying $223 in bills; a roll of 53 one dollar bills in his front pocket and 4 fives, 11 tens, and two twenties in his wallet. After defendant claimed that he had recently been paid in cash and had been skiing all day, the officer accompanied him to the Ingalls house on River Road where defendant showed him a mutilated ski ticket as well as a rifle that did not match the description of the rifle used in the robbery.

Upon arrival at the store, officers investigating the crime scene went to the side of the store and noticed at a location behind the ice machine several footprints in the snow as well as an indentation in the snow shaped like a rifle butt. A police dog tracked the footprints from the store one quarter mile to the Ingalls residence on River Road where defendant lives with his mother and brother. An officer observed footprints near the door of the Ingalls house identical to those observed at the side of the Puffin Stop.

The police arrested Bryan Ingalls. When the police searched the Ingalls home they found in an upstairs bedroom closet a rifle with Bryan Ingalls' fingerprint on the scope. That rifle was identified at trial as the rifle used in the robbery. The police

also found on the living room coffee table a bullet that a firearms expert testified had been loaded in that rifle. In the downstairs front hall closet, the police found the ski jacket and ski mask worn by the robber. At the bottom of the cellar stairs, the police found boots with soles matching those making the footprints at the Puffin Stop and the Ingalls house.

At trial the State presented the testimony of the man whom Ingalls worked for part time to the effect that Ingalls had received $160 in cash several days prior to the robbery. Another witness testified that she worked at a business located across Route 302 from the Puffin Stop and as she was leaving work just before the robbery noticed a man watching the Puffin Stop from across the road. She further testified that she knew Ingalls and thought that the individual was Bryan Ingalls because he was wearing a blue ski jacket similar to the one she knew Ingalls had been given several years earlier.

The defense called defendant's brother Glenn, who testified that defendant often carried large sums of cash divided between his front and back pockets, that defendant had helped him to adjust the scope of the rifle on which his fingerprint was found, and that he had never seen defendant wear the items of clothing identified as having been worn by the robber.

## II.

Defendant contends that certain comments by the prosecuting attorney in closing argument impermissibly directed the jury's attention to defendant's failure to testify. In *State v. Tibbetts*, 299 A.2d 883, 889 (Me.1973), we held that a prosecutorial comment on a defendant's failure to testify can never be deemed harmless error when the comments were "direct, non-ambiguous and unequivocal ... on the failure of a criminal defendant to become a witness" or "indirect ... without equivocation or ambiguity, suggest[ing] that a jury must accept as true the State's evidence because it is undenied by a criminal defendant as a witness." Defendant admits that the comments were not direct, unambiguous refer-

ences to his failure to testify, but correctly points out that even ambiguous and indirect prosecutorial comments might be prejudicial error if they could be understood as a comment on the defendant's failure to testify. *Id.* As a first step, we look at the prosecutorial statements pointed to by defendant to see if they could be understood as at least ambiguous comments on defendant's failure to testify.

■ In his principal closing argument, the prosecuting attorney summarized the evidence presented at trial and suggested that the inferences drawn from the circumstantial evidence when viewed as a whole left no reasonable doubt that defendant was the person who robbed the Puffin Stop. The prosecuting attorney then observed:

Now, there were some promises that haven't been fulfilled to you, and those were the Defendant's promises himself when in his opening he was going to tell you about the access that the whole neighborhood had apparently to the Ingalls' residence. Now you have not heard one bit of testimony about anybody, about a key over a ledge or the open door or any access that anybody had to that house.

The prosecuting attorney's comments referred to defense counsel's statement in his opening remarks that:

You are going to hear evidence from Mr. Ingalls' brother, Glenn, that the house, it's in a rural neighborhood, is always open, the front door is always open. There is a key above the ledge on the side door. Everybody knows it's there.

We reject defendant's characterization of the prosecuting attorney's linking of certain promises made in defense counsel's opening with the complete absence of any testimony concerning public access to the Ingalls home as an indirect comment on defendant's failure to testify. When those statements are considered in the context of the entire record, as they must be, *see Tibbetts*, 299 A.2d at 890, it is obvious that the prosecuting attorney was referring to defense counsel's representation in his

opening that Glenn Ingalls would testify about the access that allegedly anybody in the neighborhood had to the Ingalls house. It is to be noted that even though defense counsel put Glenn Ingalls on the stand, he was not questioned on the subject matter referred to in counsel's opening. Defense counsel himself recognized the prosecutor's remark as a reference to his own opening statement concerning Glenn Ingalls' testimony and acknowledged in his closing argument that "[the prosecuting attorney] correctly points out, I sort of fell asleep, and I did not demonstrate the access, so I won't even talk about that at this point." Since the jury could not understand the prosecuting attorney's remarks as a comment on defendant's failure to testify, there is no error.

■ Defendant contends as well that statements made by the prosecuting attorney during his rebuttal closing argument also impermissibly directed the jury's attention to defendant's failure to testify. In that rebuttal closing argument the prosecuting attorney summarized the evidence refuting the defense theory offered in closing argument that someone placed the items used in the robbery in Bryan Ingalls' home without his knowledge. The prosecutor then stated:

[T]hat is not what occurred and there's no reasonable doubt in this case, all of these things did not occur, there is no testimony that anybody had anything against Bryan Ingalls, there's no testimony that anybody had access to his house, that anybody was looking to frame him, that anybody had a revenge motive against him, nothing. So you would have to believe that somebody dropped out of the blue. And what kind of planning would that have taken for someone to have done—to frame Bryan Ingalls? Think of that.

Unlike the earlier remark concerning the access to the Ingalls home, the prosecuting attorney's remarks about the lack of testimony concerning the existence of a grudge or revenge motive to explain the alleged framing of Bryan Ingalls was not a direct response to any remark by defense counsel. The prosecuting attorney apparently was attempting to discredit the defense theory outlined in closing that the actual robber had left the items used in the robbery at the Ingalls home. A jury could infer from the prosecuting attorney's remarks, however, that Bryan Ingalls was the logical and best witness to identify individuals holding grudges against him. One inference from the prosecuting attorney's reference to the lack of testimony concerning grudges against Bryan Ingalls is that since Ingalls did not testify to any grudges, no grudges exist to support the defense theory that someone else put the items used in the robbery in Bryan Ingalls' home. Although not a direct, unambiguous comment on the defendant's failure to testify, a jury could understand the prosecuting attorney's rebuttal statements as an ambiguous comment on defendant's failure to take the stand and offer support for the defense theory.

In *Tibbetts* we formulated a standard for appeals from improper prosecutorial comments on defendant's failure to testify. In developing the standard that we felt was "constitutionally required and made obligatory upon us under the Fifth Amendment through the medium of the Fourteenth Amendment," we looked to the Supreme Court's definition of harmless error set forth in *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), as further refined by *Anderson v. Nelson*, 390 U.S. 523, 88 S.Ct. 1133, 20 L.Ed.2d 81 (1968), and *Fontaine v. California*, 390 U.S. 593, 88 S.Ct. 1229, 20 L.Ed.2d 154 (1968). *Tibbetts*, 299 A.2d at 888. In a more recent refinement of the *Chapman* inquiry as applied specifically to improper prosecutorial comments on defendants' failure to testify, issued after our decision in *Tibbetts*, the Supreme Court has more clearly articulated the proper question to ask when the prosecuting attorney has at least ambiguously commented on a defendant's failure to testify: "[A]bsent the prosecutor's allusion to the failure of the defense to proffer evidence to rebut the testimony [at trial], is it clear beyond a reasonable doubt that the jury would have returned a verdict of guilty?" *United States*

v. Hasting, 461 U.S. 499, 510–11, 103 S.Ct. 1974, 1981, 76 L.Ed.2d 96 (1983). Although in Tibbetts we articulated the standard as whether beyond a reasonable doubt the evidence would not support acquittal, it is now apparent from Supreme Court cases decided in the 15 years after Tibbetts that the appropriate focus is whether on the whole record before us the prosecutorial comment though error was harmless beyond a reasonable doubt. See id. at 510, 103 S.Ct. at 1981. Again we quote the Supreme Court's Hasting opinion, which involved the identical type of constitutional error as the case at bar:

> Since Chapman, the Court has consistently made clear that it is the duty of a reviewing court to consider the trial record as a whole and to ignore errors that are harmless, including most constitutional violations. The goal, as Chief Justice Traynor has noted, is "to conserve judicial resources by enabling appellate courts to cleanse the judicial process of prejudicial error without becoming mired in harmless error." [R. Traynor, The Riddle of Harmless Error 81 (1970).]

Id. at 509, 103 S.Ct. at 1980 (citations omitted). In applying the harmless error rule to an improper prosecutorial comment, we are not required to reverse merely because it is possible for an appellate court to "imagine a single juror whose mind might have been made up because of [that comment] and who otherwise would have remained in doubt and unconvinced." Harrington v. California, 395 U.S. 250, 254, 89 S.Ct. 1726, 1728, 23 L.Ed.2d 284 (1969). Instead, "[o]ur judgment must be based on our own reading of the record and on what seems to us to have been the probable impact of the [improper prosecutorial comment] on the minds of an average jury." Id. As Chief Justice Traynor explained in his discussion of the Harrington case, "The Court's inquiry was directed, not to the effect of the error on the actual jury or to the reasonably possible effect of the error on an average jury, but to its probable impact on such a jury." R. Traynor, The Riddle of Harmless Error at 45 (emphasis in original).

Looking at the entire record in this case, we conclude that the prosecutor's statement pointing out the absence of any evidence to support the defense theory that some unnamed individual set up defendant by leaving the items used in the robbery at his home was harmless in its probable impact. In the case at bar, defense counsel, through cross-examination of the State's witnesses and the testimony of Glenn Ingalls, attempted to suggest that despite the overwhelming circumstantial evidence linking defendant to the robbery at the Puffin Stop, someone other than defendant ran from the Puffin Stop to defendant's home, entered and placed the items used in the robbery in four separate locations on three different floors of the home and left before police arrived. We can say here exactly as we did in State v. Inman, 350 A.2d 582, 595 (Me.1976):

> The complete absence of evidence tending to show that [defendant] could not have committed the crime, the meager amount of evidence which, if believed, would tend to show that it was unlikely that he did so when viewed against the evidence pointing toward guilt ... satisfy us beyond a reasonable doubt that the prosecutor's ill-advised comment was, in fact, harmless.

(Emphasis in original)

### III.

■ Defendant's contention that the evidence was not sufficient to support the jury's guilty verdict is utterly without merit. "A conviction based on circumstantial evidence is not for that reason any less conclusive." State v. Gagnon, 383 A.2d 25, 31 (Me.1978).

> When each separate circumstance as appears in this case is viewed in the context of its relation to the others, the resulting pattern knitted together by the forceful rational inferences to be drawn from the several circumstances compels the irresistible conclusion of guilt.

Id. A jury rationally could find beyond a reasonable doubt every element of the crime charged. See State v. Barry, 495 A.2d 825, 826 (Me.1985).

The entry is:
Judgment affirmed.
  All concurring.